**UNITED STATES of America,
Appellee,**

v.

**Robert AARON, Appellant.
No. 232, Docket 71–1765.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 3, 1971.

Decided March 10, 1972.

Marshall Tamor Golding, Atty., Dept. of Justice, Robert A. Morse, U. S. Atty., for appellee.

Jerome Lewis, Thomas R. Newman, Benjamin H. Siff, New York City, for appellant.

Before WATERMAN, SMITH and TIMBERS, Circuit Judges.

WATERMAN, Circuit Judge:

Appellant, Robert Aaron, after a jury trial in the United States District Court for the Eastern District of New York, was convicted of having violated 18 U. S.C. §§ 371, 495, and 2. He had been charged in three counts of a five count indictment and was convicted on all three. In one count it was charged that he and one Michael LaBarbara forged the endorsement of the payee, one Robert P. Fleisher, on a $4,000 U. S. Treasury check, in a second that he and LaBarbara uttered and published that forged check, and in a third that he, LaBarbara, together with a Henry Mandatto, a Stuart Vort, and a co-conspirator, one Allen Magid, an informer, con-

spired to forge and to utter forged U. S. Treasury checks. In the two remaining counts of the indictment only La-Barbara, Mandatto and Vort were charged. The jury acquitted LaBarbara upon all five counts and Mandatto upon the three for which he had been indicted. Vort was convicted on the three counts upon which he had been charged. Neither Aaron nor LaBarbara nor Mandatto took the stand in his own behalf.

During the trial the prosecutor, pursuant to the Jencks Act, 18 U.S.C. § 3500, furnished defense counsel with certain materials. Due to an apparent inadvertence on the part of the Government one of two reports of an FBI agent, one Anthony Villano, was not included in the materials. During the cross-examination of the agent it became obvious that the failure to supply this report to the defense prior to the cross-examination prejudiced the defendant, and the presiding judge, Judge Weinstein, made efforts aimed at minimizing this prejudice so as to prevent a mistrial. In spite of the judge's well-intentioned and well-calculated measures the policies underlying the Jencks Act require us to reverse the conviction and demand that we order a new trial.

The relevant facts may be stated briefly. Appellant was the manager of a jewelry store and had been earning between $20,000 and $25,000 a year. He had full authority to buy and sell diamonds and to cash checks. LaBarbara possessed a package of stolen U. S. Treasury checks, among them one made payable to a Robert P. Fleisher in the amount of $4,000. Appellant was approached by codefendants Vort and Mandatto and by a co-conspirator, Allen Magid, a government informer and the Government's principal witness at the trial, in order to have appellant assist in disposing of LaBarbara's package of checks.

The government testimony tended to prove that appellant did indeed cooperate with the other defendants and with Magid in plotting to dispose of the La-

Barbara package. Magid was the first government witness. He testified that they adopted a scheme by which the appellant would accept one or two of LaBarbara's stolen checks as payment for items of jewelry from the shop appellant managed, and that one exchange was actually made in which the $4,000 check made payable to Robert Fleisher - was taken by Aaron as "payment" for a $4,000 diamond ring sold at a discounted price of $3600. Aaron then gave the ring so "sold" to Magid, Vort and Mandatto with the understanding that it was to be delivered by them to LaBarbara.

Despite the fact that it would appear from the record that Magid's credibility had been so tarnished by the cross-examination of trial counsel as to cause his testimony relative to the subject-matter of any conversations to be of doubtful validity, Magid also testified that Aaron had told him that he had endorsed Fleisher's name on the check.

Appellant's employer was the Government's second witness. He testified that Aaron told him of the $3600 sale for which Aaron had taken the $4000 check and told him that the $400 in change taken from the till had been given to Fleisher when Aaron agreed to sell Fleisher the ring, priced at $4000, at a 10% "discount." Beyond peradventure, therefore, if the testimony of these two witnesses could be believed, appellant defrauded his employer of a ring of the retail value of $4000 and cash of $400 which appellant pocketed.

Inasmuch as appellant was a trusted employee, was earning between $20,000 and $25,000 a year, and had every prospect of continuing in his employment, the Government sought to establish by these two witnesses that appellant risked his job and his future because he badly needed a large amount of money. Neither of the witnesses was free on the ground of personal interest from impeachment attack. Although Magid's demolishment occurred on cross-examination, on direct he testified that he was involved as a principal in this criminal affair. Norman Savel, the employer, had suffered a $4400 unrecoupable loss. Moreover, appellant himself, unless in some way indebted to the others in the scheme, more particularly perhaps to LaBarbara, had personally profited by his risky performance to the extent of only $400. Magid testified that he had been introduced to Aaron by one whom he described as a loan shark who claimed Aaron owed him money from dealings many years earlier and that Aaron owed Magid $4000 for work done by him on Aaron's house.

Savel testified, over objection, that he had been contacted by hotels in Puerto Rico and Las Vegas which claimed Aaron owed them some $13,000 and that Aaron had acknowledged that he had, in fact, signed "markers" to such hotels for $13,000 of gambling debts but that these sums were actually owed by another person who would pay them.

It is in connection with this effort to ascribe to appellant a motive for his criminality that the Government's failure to comply with the Congressionally-imposed requirements of the Jencks Act after Villano had testified on direct examination prejudiced the defense.

The third government witness was Agent Anthony Villano, an agent of the Federal Bureau of Investigation. He testified that on November 21, 1968 appellant had told him that he owed some $15,000 to two gambling casinos, one in Puerto Rico and one in Las Vegas. At the conclusion of the agent's testimony, the Government appeared to comply with the Jencks Act by furnishing appellant's counsel with a copy of Agent Villano's Form 302 FBI report. That report related to Villano's November 21 conversation with appellant and there was no mention in it of any statement by appellant that he owed any gambling debts. Defense counsel seized upon this discrepancy between the report and the witness-stand testimony. The relevant cross-examination ran as follows:

Q. Did you ever put in there one word in your report that Mr. Aaron

told you that he owed $15,000 to gambling casinos?

A. Yes, sir.

Q. Show it to me in that report.

A. I prepared two reports, sir.

Q. You mean the government has another report that they didn't turn over to us?

A. I didn't furnish it to the—to Mr. Lynch here.

Q. Oh come on.

Mr. Lewis [defense attorney]. I ask for a recess, Judge.

During this recess it developed that the prosecutor had learned of the second report made by Villano and of its contents only a few hours before Villano testified and that he had been unsuccessful in his attempts to locate it before Villano took the stand. Yet, even though he saw fit to ask the agent on direct examination about the contents contained in this second report the prosecutor in no way attempted prior to the cross-examination to inform the cross-examiner of its existence. Judge Weinstein sought to clarify the situation by instructing the jury:

> I have examined the reports in connection with this case and I find nothing in connection with the applicable report that says anything about a gambling debt by Aaron in connection with the statement made by Aaron to this agent.

Clearly, the purpose of Judge Weinstein's remark was to cause the jury to believe that the agent's recollection of his conversation with Aaron about gambling debts was not supported by any memorandum he made of that conversation.

For the sake of discussion we may accept the position that the court's comment neutralized the immediate impact of Agent Villano's reply and left undamaged the cross-examiner's attack upon the credibility of a man who testified to a matter of importance he had talked about with the defendant but of which he had made no memorandum at the

time of it. The combination of the Government's failure to comply with Section 3500 and the court's well-intentioned instruction to the jury resulted, nonetheless, in a more subtle form of prejudice to the defense. The defense was now limited in the scope of effective cross-examination of Villano, for the defense was now precluded from impeaching the agent's testimony on the grounds that he had made two materially different reports about the content of a single conversation he had had with the accused. As was pointed out by the Supreme Court in Clancy v. United States, 365 U.S. 312 at page 316, 81 S.Ct. 645 at page 648, 5 L.Ed.2d 574 (1961):

> Since the production of at least some of the statements withheld was a right of the defense, it is not for us to speculate whether they could have been utilized effectively. As we said in Jencks v. United States, *supra,* 353 U.S. [657] 667, [77 S.Ct. [1007] 1013, 1 L.Ed.2d 1103] (1957):
>
> > "Flat contradiction between the witness' testimony and the version of the events given in his report is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony."

Had Aaron's trial counsel been supplied with both reports he might well have asked questions casting doubt upon their accuracy and coloring the credibility of the maker of them without ever referring to the fact that gambling debts were in either of the reports. But after counsel's open consternation over the existence of the second report, which had not been supplied to him, any attempt to impeach on the ground of inconsistent reporting would have made him appear to be belaboring a bad point and would have caused the jury to suspect him of pettifogging. Moreover, any further

cross-examination in this area might have brought the jury's attention to the ambiguity of the court's words "nothing in connection with the *applicable* report [emphasis added]." Again the jury's attention would have focussed on Aaron's disputed gambling debts. In light of these factors Aaron's attorney was well advised to steer clear of the area and instead to move for the mistrial denied him.

It is indeed true, as the Government points out, that the cross-examination of Agent Villano was the product of a tactical decision made by the defense and the Government claims "harmless error" here. Yet the first decision was undoubtedly decided upon by the cross-examiner because of the Government's knowing failure to comply with Section 3500, and the court's later well-intentioned instruction could not neutralize the damage done by that government omission.

The Jencks Act was intended "to provide defendants in federal prosecutions with an opportunity for thorough cross-examination of government witnesses, making the constitutionally guaranteed right of confrontation more meaningful." United States v. Missler, 414 F.2d 1293, 1303 (4 Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 912, 25 L. Ed.2d 93 (1970). Because the Jencks Act requirement was not here complied with the defense was deprived of the opportunity it was entitled to have. Therefore, the Government's reliance on the "harmless error" doctrine of Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959) is misplaced. Moreover, this court has recently expressed its concern that the Congressional mandate of Section 3500 be not disregarded. We stated in United States v. Hestie, 439 F.2d 131 (2 Cir. 1971) at page 132:

> Frankly, we cannot understand why Assistant United States Attorneys in this circuit should fail to observe the procedures relative to the turning over of Jencks Act material that was specified in United States v. Gardin,

382 F.2d 601, 605–606 (2 Cir. 1967). We take this opportunity to warn them and their supervisors that further lapses may not be condoned.

We need not attempt to weigh with mathematical precision whether the withholding from the defense of a particular pre-trial statement made by a government witness violated the defendant's right to the full information the Jencks Act grants him. We agree with Judge Sobeloff's approach in the *Missler* case, 414 F.2d *supra* at 1304, where he pointed out that "[u]nless it is perfectly clear that the defense was not prejudiced by the omission, reversal is indicated." Moreover, it is of little significance to the defense in this case that the Government's failure to furnish was inadvertent. The prosecutor before turning the witness over to the cross-examiner knew of the existence of the second report and had an opportunity to relay that information to Aaron's counsel. This he did not do. We are convinced from a reading of the record that it is not perfectly clear that the defense was not prejudiced by the Government's failure.

Accordingly, the judgment is reversed and the case remanded for a new trial.

TIMBERS, Circuit Judge (dissenting):

I respectfully dissent.

Few aspects of the trial of a criminal case present more administrative difficulties than those arising under the Jencks Act, 18 U.S.C. § 3500 (1970). The objective of the statute and the decisional law construing it is to maintain insofar as possible that delicately calibrated balance between the rights of the accused and the rights of the government. With the guidelines as imprecise as they necessarily are, our best hope of achieving that objective, it seems to me, is to encourage the wise and comprehending trial judge who, on the firing line, displays good judgment in handling a tough dilemma in such a way as to maintain that balance. I think this case

is a prime example of good judgment on the part of the trial judge.

The government admits its error in initially producing only the one report by Agent Villano, without informing defense counsel or the court that a second report existed. But failure to comply with the Jencks Act is reversible error only if the defense has been prejudiced. Rosenberg v. United States, 360 U.S. 367, 371 (1959); United States v. Hestie, 439 F.2d 131, 132 (2 Cir. 1971); United States v. Gardin, 382 F.2d 601, 606 (2 Cir. 1967). Here the trial record, in my view, shows that the error in question was harmless.

Appellant essentially contends that delayed production of the agent's second report [1] led his counsel into an improvident line of cross-examination which resulted in the jury's knowing that the agent had given a prior consistent statement, a fact which otherwise would have been inadmissible. The court, however, removed any possible prejudice by an instruction which in effect told the jury that no prior consistent statement existed—an instruction, if anything, more favorable than appellant deserved.

Assuming *arguendo* that the court's instruction neutralized the corroborative impact of the agent's reply, the majority nevertheless concludes that the combination of the government's failure to comply with the Jencks Act and the court's instruction to the jury precluded the defense from impeaching the agent's testimony on the ground that he had made two materially different reports about the content of a single conversation he had had with the accused. With deference, however, I do not believe that this conclusion is supported by the record. The majority tends to gloss over the fact that the second report was made available in time to afford the defense ample opportunity to use it to impeach the agent. Furthermore, prior to the court's suggestion that it give the instruction which appellant now challenges on appeal for the first time, defense counsel had time to review the second report and to ascertain whether it could be used to impeach the agent. If defense counsel had believed that the report would be valuable in cross-examining the agent, he would have objected to the proffered instruction or suggested an alternative way of handling the problem. Indeed, the trial judge, in addressing defense counsel, offered to do "[a]nything you want me to do." Defense counsel's failure to object to the instruction and to pursue a line of cross-examination based on the material differences between the two reports reflected a deliberate tactical decision on his part that greater advantage lay in foregoing further cross-examination and relying upon the court's instruction. Thus, defense counsel's failure to cross-examine the agent with respect to the second report resulted not from the combination of the government's error and the court's instruction, but from defense counsel's belief that such cross-examination would be of no avail to appellant.

While I would not hesitate to reverse in an appropriate case of failure to observe the procedures relative to turning over Jencks Act material, United States v. Hestie, *supra*, 439 F.2d at 132; United States v. Gardin, *supra*, 382 F.2d at 604–06, *and where prejudice to the defense has been demonstrated,* this is not such a case. Here an unintentional, understandable and brief delay in producing a second report of the agent still on the stand resulted in a curative instruction by a conscientious trial judge who further offered to do anything else defense counsel wanted him to do. Experienced defense counsel (same as on appeal) chose not to avail himself of the

---

[1]. As so often happens where the accused is the subject of more than one investigation, the second report here in question was in another case file. The Assistant United States Attorney so informed the court:

"May the record further show, your Honor, that it came from page 16 in a 73 page report in an entirely different investigation?"

trial judge's extraordinarily fair offer, nor to object to the instruction as given. I am left with the firm conviction that no prejudicial error was committed.

Absent prejudicial error in the only point raised on appeal and in view of the overwhelming evidence of guilt so clearly set forth in Judge Waterman's complete and fair statement of the facts in the majority opinion, I would affirm the judgment of conviction.