**UNITED STATES of America,**
**Appellee,**

**v.**

**Michael CATALANO et al., Defendants-**
**Appellants.**

**Nos. 199, 237, 303, Dockets 73–1559,**
**73–1984, 73–1985.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 26, 1973.

Decided Jan. 21, 1974.

Herbert I. Handman, New York City, for appellant Catalano.

Neal J. Hurwitz, New York City, for appellant Goldman.

Herald Price Fahringer, Buffalo, N. Y. (Joseph Panzer, New York City, of counsel), for appellant Dellacroce.

Shirah Neiman, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty. S. D. N. Y., New York City, Robert·P. Walton, James E. Nesland, Michael B. Mukasey, Richard Wile, John W. Nields, Jr., Asst. U. S. Attys., of counsel), for appellee.

Before MANSFIELD, MOORE and OAKES, Circuit Judges.

MOORE, Circuit Judge:

Aniello Dellacroce, Michael Catalano and Martin Goldman appeal from judgments of conviction entered against them in the United States District Court for the Southern District of New York after a jury trial and from orders denying motions for a new trial. The indictment contained three counts. Count ONE charged a conspiracy amongst the three defendants and certain non-defendant co-conspirators to evade income taxes due from Dellacroce to the United States for the calendar year 1968 (26 U.S.C. § 7001, 18 U.S.C. § 371). Count TWO charged Dellacroce with filing a false tax return for that year (26 U.S.C. § 7201). Count THREE charged Dellacroce with making and subscribing a false tax return wherein "wages, salaries, tips, etc." were stated as $10,400 whereas in fact and to his knowledge they were $134,500 (26 U.S.C. § 7206(1)). All three defendants were convicted of conspiracy; Dellacroce, in addition, was found guilty of false filing and tax evasion.

Many trial errors are asserted by the defendants; many overlap. To the extent that they are claimed to apply only to one of the defendants, they will be considered as to him alone.

## The Conspiracy

The gist of the conspiracy to enable Dellacroce to defraud the government of income taxes is that in 1968 Dellacroce allegedly received 22,500 shares of Yankee Plastics, Inc. stock (valued at approximately $123,000) for services rendered by Dellacroce and Catalano (1) to help Yankee Plastics, Inc. acquire a company known as Mr. Hanger, Inc. and (2) to insure "labor peace" for Mr. Hanger, Inc. In order to avoid showing this stock as income to Dellacroce (and hence to evade a tax to him), devious means were employed. The 22,500 shares were placed in the name of a nominee, Preston Smith. The certificates representing these shares were never in the physical possession of Dellacroce. Thus the government's case is based upon his dominion and control of the shares and his resultant constructive possession.

To trace the physical custody of the 22,500 chares requires the introduction of other persons, Rosen, Goldman, Terranova and Catalano.

Rosen and Goldman, using Preston Smith as a nominee, purchased 15,000 shares of Mr. Hanger, Inc. which, upon its merger with Yankee Plastics, became 22,500 shares of that company's stock. In the summer of 1968, Goldman told Terranova, the government's chief witness and through whom these transactions became known, that the shares were being held for Dellacroce in Smith's name so that Dellacroce would not have to report them as income. Goldman requested Terranova to replace Smith as nominee. Accordingly, the single certificate for the 22,500 shares in Smith's name was cancelled and forty-five 500-share certificates, issued in Smith's name but endorsed by Smith with a signature guarantee, were delivered by Goldman to Terranova. The stock was now in negotiable form.

Goldman and Terranova then opened an account, still using Smith's name, with Francis I. duPont and Company and deposited the 22,500 shares there.

Catalano enters the picture, according to Terranova's testimony, as an accomplice and employee of Dellacroce.

During the ensuing months, there were many meetings between Goldman and Terranova on the one hand and Dellacroce and Catalano on the other, at which the stock, still in the brokerage account, was discussed. Dellacroce was advised not to sell since it was thought that Yankee Plastics was doing well. However, the stock was eventually removed from the duPont account and kept in offices at 312 Fifth Avenue, maintained by a company operated by Goldman and Terranova. In May 1969 they (Terranova and Goldman) put 7,500 shares into an account with First Hanover Corporation. In June 1969 4,000 shares were sold, realizing some $21,000. The remaining 3,500 shares were delivered to Terranova. In November 1969 the balance of the 22,500 shares (37 certificates for 500 shares each) were delivered into the custody of a private attorney, and in March 1971 they were released to Terranova's wife who, in turn, gave them to Goldman. The 37 certificates finally reappeared via Goldman's attorney at the trial, ostensibly from Goldman.

The theory of the government's case is that Dellacroce received the stock in 1968 in payment for services rendered by him and his assistant, Catalano, to insure labor "peace" and to aid in the merger of Mr. Hanger and Yankee Plastics. Despite the many resting places of the stock and the inferentially suspicious character of the methods employed, the fundamental appellate question is centered around the testimony that the stock was given to Dellacroce for his services and was handled in such a way as would enable him to evade income taxes thereon. There was much embellishing proof which would support inferences to this effect but essentially the case rests upon jury belief or disbelief in Terranova's testimony. It chose to believe. It also chose to believe the involvment of Goldman and Catalano.

Each appellant, however, raises particular points of alleged trial error which must be considered separately.

*Dellacroce*

██ Dellacroce argues that in his previous appearance before a New York County grand jury he received transactional immunity regarding events relating to the subject matter of the present indictment. This previous grant of immunity places upon the government a heavy burden of proving that the indictment did not stem from information given to the grand jury. If this were not so, a defendant's Fifth Amendment rights would be considerably abrogated, Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The problem is complicated in this case by the fact that the County Assistant District Attorney who interrogated Dellacroce before the grand jury transferred from the County to the Federal prosecutor's office and in part presented this case to the Federal grand jury. In this case, however, that burden was met. Dellacroce's testimony before the grand jury was circumspect in the extreme; so much so that he was cited for contempt. Further, the large bulk of the questions were of a leading nature from which it may be concluded that the prosecutor knew what the response would be. This conclusion is buttressed by an affidavit of Goldman dated before the grand jury hearings, covering the subject matter of several of the questions.

██ A hearing on Dellacroce's motion to dismiss the indictment led the court to conclude that nothing material had been disclosed in Dellacroce's County grand jury testimony which provided the Federal prosecutor's office with either information or leads. In keeping with the mandate of *Kastigar* the proof, which included testimony by the former County (and later Federal) prosecutor, not only negatived any possibility of taint, but also carried the affirmative burden of proving a legitimate, wholly independent source of evidence. In the face of this showing Dellacroce would

have us hold that access to grand jury testimony *ipso facto* prevents the government from carrying its burden under *Kastigar*. This we decline to do. Neither Murphy v. Waterfront Commission, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), nor Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), purports to establish such a peremptory rule. United States v. McDaniel, 482 F.2d 305 (8th Cir. 1973), relied upon by Dellacroce, is clearly distinguishable. The defendant there, in his prior testimony before the State grand jury, had poured forth three volumes of self-incriminating testimony. The court sensibly concluded that the United States Attorney who read this testimony in its entirety could not wholly obliterate it from his mind in his preparation and trial of the federal case. Furthermore, unlike the present case, the United States Attorney there made no attempt to show that he had prior knowledge of the information revealed by the grand jury testimony and his offer of F.B.I. reports as proof of an independent source failed to satisfy the burden of showing that he had not used the testimony in some significant way short of introducing it. By way of contrast the prosecutor here established that he had prior knowledge of substantially all the information covered in the Dellacroce testimony, thus foreclosing the possibility that he made "any use, direct or indirect, of the compelled testimony and any information derived therefrom." Kastigar v. United States, 406 U.S., at 460, 92 S.Ct. at 1664. A review of the record supports this conclusion. The *Kastigar* rule is aimed at preventing the misuse of information gained under a grant of immunity; it does not require information not gained in this fashion to be discarded. The motion to dismiss the indictment was properly denied.

██ Dellacroce next argues the question which to him "dominates this appeal" (Dellacroce Br. p. 27). He states that he "cannot be convicted of income tax evasion for failure to report the alleged receipt of stock which was

not registered in his name, which was never possessed by him, and which was being held in escrow subject to adverse claims." He is, of course, correct that he is not taxable for income that he never received. However, the test of receipt is not the registering of the stock in one's name. This contention ignores the entire theory of conspiracy and of constructive possession. Were Dellacroce's contention correct, anyone wishing to shelter income could have it paid to a nominee and kept in the custody of another. Thus, it was for the jury to decide whether he possessed it or not. Likewise, the contention that the stock was subject to adverse claims, sufficient to prevent his constructive possession, was one properly submitted to the jury and decided by them.

■ Dellacroce further alleges that there was error in the admission of a statement by Goldman which stated in part that he knew Dellacroce, employed him, met with him at the Ravenite Club, knew him to meet there with Catalano, and knew the relationship between Dellacroce and Catalano. It is contended that under the rule of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), this statement should have been excluded. However, this argument disregards the fact that independent evidence was presented to support each factual proposition made by Goldman, linking Dellacroce to the conspiracy. *Bruton* extends only to situations where "the testimony concerning the complaining co-defendant is clearly inculpatory . . . and (2) the testimony is vitally important to the government's case." United States v. Cassino, 467 F.2d 610, 623 (2d Cir. 1972), cert. denied, 410 U.S. 928, 93 S.Ct. 957, 959, 35 L.Ed.2d 276 (1973). In this case the complained-of testimony was merely repetitive of other evidence, and the careful admonitions of the judge that the jurors consider the Goldman statement only against him makes any improper use of the statement highly unlikely.

■■ Dellacroce next contends that evidence concerning a gambling trip allegedly made by him to Puerto Rico in 1968 under an assumed name was irrelevant to the present case and thus improperly admitted. The government argued that the evidence was proper in that it was probative of Dellacroce's intent to evade taxes, certainly an important element of the charged offense and, on this basis, it was admitted. A gambling "junket" usually has one of two results—profit or loss. If profit were the result, an alias would be useful to hide the gain from scrutiny by the I.R.S. Thus, it might well be that the use of an alias during a gambling trip made in the year of the alleged tax evasion bears on the intent to evade tax. Of course, there might be several alternative reasons why Dellacroce may have used an assumed name. His counsel was free to suggest any of these or to offer evidence that Dellacroce did not go to Puerto Rico at all in that year or that he did not do so under an assumed name. However, the fact remains that the use of an alias under the circumstances is relevant to an intent to evade taxes although it is certainly far from conclusive. The degree of relevancy required for admissibility is one that generally is determined in the discretion of the trial court—a discretion correctly employed here.

■ An allied argument raised by Dellacroce is that the prejudicial implications of this evidence outweighs its probative worth. It is stated that "[t]his condemning evidence became a 'damned spot' on appellant's case of which he could not rid himself." (Dellacroce Br. p. 42). Certainly, potential prejudice to the defendant is a factor to be considered in weighing the pros and cons of admitting a particular piece of evidence. For this reason evidence of a prior crime may only be introduced in limited circumstances, C. McCormick, A Handbook of the Law of Evidence, § 157 (1954). In this case, however, the actions of Dellacroce did not constitute a crime since he did not, in fact, win any money. Thus, the trial judge was not faced with the problem of a prior crimi-

nal act. This, however, did not relieve him of his general duty to balance probative worth against potential prejudice. The lengthy dialogue between judge and prosecutor (312a–319a) concerning this bit of evidence, the instruction to the jury at the time of its submission to them (936a), and the charge to the jury on this matter (1701a) reveal the careful consideration given to the possibility of prejudice. Dellacroce contends that ". . . the prosecutor strategically waiting until the very end of the summation, lashed out at the jury with his highly volatile evidence [the trip to Puerto Rico], searing it into their minds." (Dellacroce Br. p. 40). Nonetheless, the probative worth of this evidence, far from being "frivolous" as it was characterized by appellant, was properly presented for jury consideration. In general, it is for the trial judge to do the balancing required here and it cannot be said that his discretion was misused.

■■■■■ Another issue raised is whether Dellacroce's motion for a new trial based on newly discovered evidence was properly dismissed without a hearing. This evidence consisted of testimony suggesting that Dellacroce did not make the trip to Puerto Rico in 1968. The judge, after learning the nature of the evidence and its source, denied the motion without a hearing on the grounds that the evidence was not newly discovered. Motions of this sort are not held in great favor. United States v. Costello, 255 F.2d 876 (2d Cir.), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L. Ed.2d 1551 (1958). In light of the facts in this case, there is no reason to believe that the court erred.

■■■■■ Finally, Dellacroce contends that the government improperly withheld information that would have helped to impeach Terranova, the government's chief witness. The information consisted of a government file on Terranova, gathered in relation to an unconnected bribery indictment against him, the records of Jody Associates, which also related to this indictment, and the logs of surveillance made in 1967 and 1968 on the Ravenite Club, a meeting place of the alleged conspirators. In addition there is a claim of error in regard to sustaining a government objection to a defense question put to Terranova in an attempt to impeach him. To deal with the files relating to the bribery indictment, the trial court, after a representation by the government that their file contained nothing on the defendant's guilt or innocence, and after its own inspection of the corporate files which also revealed nothing, denied the request for inspection. There is no doubt that this decision was proper. The defense had had a full opportunity to examine Terranova at length concerning his alleged misdeeds. There was no abuse of discretion in the judge's preventing another case being tried in his court as part of an attempt to impeach a witness.

■■■■■ The surveillance logs, which were requested under 18 U.S.C. § 3500, the Jencks Act, are related to the testimony in his trial of the agent who prepared them. He testified on his own recollection that the defendants frequented the Ravenite Club. The defense wanted the logs in an attempt to prove that Dellacroce did not attend the Ravenite Club on a particular occasion with Goldman, a meeting testified to by Terranova. The judge denied the request for inspection of these logs on the grounds that they were not verbatim or substantially verbatim reports of statements made by a witness as required by § 3500. The purpose of the Jencks Act was to provide the defense with the means of impeaching a government witness by means of a prior inconsistent statement, United States v. Aaron, 457 F.2d 865 (2d Cir. 1972), while not allowing an unrestrained search through government files. The determination of whether a particular document is within the ambit of § 3500 is ordinarily one for the trial court whose ruling should not be disturbed unless clearly erroneous, Canaday v. United States, 354 F.2d 849 (8th Cir. 1966). In this instance, since the Agent did not testify that Dellacroce

was present at the time stated by Terranova, the logs would be useless to impeach the Agent on this point. Further, these documents were not used to refresh the witness's memory before his testimony. The witness, in fact, admitted that he did not recall certain matters that could be found in the logs. Thus, it may be seen that these research surveillance logs are of the same nature as the Agent's diary as to the people he met with which has been held to be outside § 3500 in Canaday v. United States, 354 F.2d 849 (8th Cir. 1966). Therefore, there was no error here.

With respect to the question put to Terranova as to which the objection was sustained, Terranova had been interviewed by an F.B.I. Agent on July 13, 1970. The Agent had recorded in writing his version in summary form of that interview (GX30 for identification). Terranova, after reading the statement, still persisted in his lack of recollection concerning the question being asked. Thereupon, the cross-examiner asked:

"Mr. Terranova, I ask you this question and if you will, please, answer it yes or no, if you can. You have just had occasion to read this F.B.I. report dated the 13th of July, 1970. Isn't it true that nowhere in this statement do you mention anything about meetings at the Ravenite Club on Mulberry Street with Mr. Dellacroce?" The government's objection to the question was sustained. The report was not in evidence. There was no foundation laid to show that Terranova had told the Agent about any meetings or that the Agent had recorded verbatim the interview. And the Agent, himself, could have been asked whether the report recorded all that was said. Furthermore, Dellacroce's attorney was given full opportunity to ask Terranova whether he had told the Agent about the meetings, of which opportunity he took advantage by asking specifically about three meetings inside the Ravenite Club, as follows:

"I ask you, Mr. Terranova, on July 13, 1970, when you spoke with Agent Hughes in the parking lot in Hicksville on that day, on July 13 for about 20 minutes, you did not tell him, did you, anything about three meetings inside the Ravenite Club with Mr. Dellacroce? Yes or no."

The answer was, "I sincerely don't recall, sir."

Dellacroce suffered no prejudice from this incident.

### Goldman

 Turning now to the arguments of appellant Goldman, it is contended that testimony given by a government witness to the effect that Goldman had committed a prior similar act to the one charge was improperly admitted. William Stone, the witness in question, testified that in 1965 he had been hired by Goldman for the sum of $200,000, payable in stock, to handle a labor dispute between the Teamster's Union and one of Goldman's companies. Shortly after that conversation, in a meeting with Catalano and Goldman, Stone was told that Catalano would handle the matter and that Stone should not pursue it further. The judge instructed the jury that this testimony could be considered only as probative of Goldman's intent to conspire. Goldman contends that this evidence was irrelevant to the case at hand in that there was no labor dispute at all at Yankee Plastics, and that the testimony of Stone in no way suggests that Goldman knew of any intent to help Dellacroce or Catalano evade taxes. It is argued further that this evidence was highly prejudicial in that it revealed a prior criminal act. The government's response chiefly lies in the contention that this evidence had a direct bearing on whether Goldman intended the Yankee Plastics stock for Dellacroce and not for the various alternative purposes suggested by the appellants. Thus, it could well be argued the transfer would constitute income to Dellacroce and the various machinations with the stock could be taken as showing Goldman's knowledge of, and participation in, Dellacroce's attempt to evade taxes. On this theory, the evidence was properly admit-

ted, United States v. Glasser, 442 F.2d 994 (2d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971).

■ Goldman further contends that the prosecutor failed to disclose to his attorney evidence allegedly suggesting that the witness Stone had been paid for his testimony. The evidence consisted of tapes of several phone conversations between Stone and a government agent and one conversation between Stone and the prosecutor. These tapes came to light when Stone offered to sell them to Goldman for use in his efforts to reverse his conviction. It would serve no purpose to set out the contents of the tapes. It is sufficient to say that the judge below found that there was no merit in Goldman's claims and that such a finding is not unwholly supported by the evidence, United States v. Kahn, 472 F.2d 272, 287 (2d Cir.) cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973). Certainly there is no satisfactory proof that the government deliberately suppressed this evidence that would merit the application of a less stringent rule, *Id*. In light of the evidence presented, it is reasonable to conclude, as did the trial court, that Stone, by offering the tapes, was attempting to "shake down" Goldman for their price.

■ Goldman argues that he was denied a fair trial because of prejudicial publicity during the trial. Certainly the trial did gain some notoriety. However, a reading of the record reveals the great care of the judge in insuring that the jurors were not exposed to such publicity. There was no evidence that any juror saw any publicity or commentary on the case which affected his or her judgment, unlike the cases of Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) and United States v. Rattenni, 480 F.2d 195 (2d Cir. 1973) cited by appellant. Appellant's reference to Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) is equally inapposite.

■ Goldman's fourth contention is that there was insufficient evidence of, and an incorrect charge on, the issue of his knowledge and intent. As to the issue of proof there was direct testimony on this point by Terranova. If the jury chose to believe him, they certainly had the right to do so. The charge was equally proper. The court stated in part:

> To find a defendant guilty of conspiracy you must find that he knowingly and willfully joined the conspiracy with the specific intent and purpose of furthering its objective.

This read in light of the nature of the conspiracy was sufficient to apprise the jurors of the elements of the offense.

■ Goldman's fifth allegation of error centers around the court's refusal to charge the jury that they must find, beyond a reasonable doubt, that an overt act, alleged in the indictment, occurred in the Southern District of New York. However, venue need not be proven beyond a reasonable doubt, United States v. Trenary, 473 F.2d 680, 682 (9th Cir. 1973) ; *see also* United States v. Braver, 450 F.2d 799, 804 n. 11 (2d Cir. 1971), cert. denied, 405 U.S. 1064, 92 S.Ct. 1493, 31 L.Ed.2d 794 (1972). And in the present record there is abundant evidence from which a jury could find proper venue in the Southern District. Thus, this contention of Goldman's is also without merit.

Finally, Goldman contends that the government violated the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) in that it failed to reveal an alleged deal with Terranova. This point has been covered in the discussion of the final argument raised by Dellacroce and nothing more is necessary here than to reaffirm the propriety of the judge's action.

### Catalano

Turning finally to the contentions of appellant Catalano who adopts all the arguments considered above and specifically reiterates and stresses the second argument raised by Goldman concerning alleged prosecutorial misconduct, for the

reasons above stated we find that they do not constitute reversible error.

In conclusion, each argument raised by the respective appellants has been considered and found to be without merit. The judgment and the orders appealed from are affirmed.

OAKES, Circuit Judge (concurring):

I concur in the result.