UNITED STATES of America,
Appellee,

v.

Ben J. SLUTSKY and Julius S. Slutsky
d/b/a "The Nevele," Appellants.

Nos. 332, 406, Dockets 74–2004, 74–2041.

United States Court of Appeals,
Second Circuit.

Argued Oct. 21, 1974.

Decided April 18, 1975.

Herald Price Fahringer, Buffalo, N. Y. (E. Stewart Jones, Troy, N. Y., of counsel), for appellants.

Lawrence S. Feld, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty. for the Southern District of New York, Paul Vizcarrondo, Jr., Asst. U. S. Atty., of counsel), for appellee.

Dennis E. Curtis, New Haven, Conn. (Michael J. Churgin, Stephen Wizner, Michele Hermann, New Haven, Conn., of counsel), for Jerome Frank Legal Services Organization as amicus curiae.

Before MOORE, OAKES and GUR-FEIN, Circuit Judges.

MOORE, Circuit Judge:

In 1973 Ben and Julius Slutsky were tried before a jury in the United States District Court for the Southern District of New York and convicted of attempted income tax evasion [1] (three counts each, covering the years 1965–67) and of filing false partnership tax returns.[2] (Ben Slutsky, two counts; Julius Slutsky, one count). The district court imposed both prison sentences and fines on the defendants, the prison sentences on each count to run concurrently, but the fines to be cumulative. On appeal, this court affirmed the convictions on the evasion counts but reversed and vacated the false filing convictions and the sentences imposed thereon. United States v. Slutsky, 487 F.2d 832 (2d Cir. 1973), cert. denied, 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 287 (1974). The net result of this action was that each defendant had a remaining sentence of five years imprisonment and a $30,000 fine, the sentences imposed by the district judge for the evasion counts. 487 F.2d at 846 n. 18.

Thereafter, the Slutskys made two motions in the district court. The first was a motion for a new trial, or, in the alternative, for a hearing to determine the issues raised by the motion, brought pursuant to Fed.R.Crim.P. 33. The second was a motion under Fed.R.Crim.P. 35 for reduction of sentences. Judge MacMahon denied both motions in all respects, and the Slutskys filed this appeal.

---

1. 26 U.S.C. § 7201 (1970).

2. 26 U.S.C. § 7206(1) (1970).

## I.

The motion for a new trial was based on newly discovered evidence,[3] but before discussing the nature of this evidence a brief background discussion is in order.[4]

During the years in question, 1965–67, Ben and Julius Slutsky were the only partners in The Nevele Hotel, a resort complex located in the Catskills. After a routine IRS audit conducted in 1967 uncovered certain irregularities involving bank deposits which exceeded reported income, a full investigation was started, culminating in the nine-count indictment on which the Slutskys were ultimately convicted.

At trial, the government proved its case using the "bank deposits" method of proof. That is, the government showed the size of deposits in the bank accounts used by the Hotel and its owners, adjusted this figure to give the taxpayers credit for properly claimed deductions and identifiable non-income items, and showed that this adjusted figure exceeded reported income for the relevant years. The burden was then on the Slutskys to explain the discrepancy.

As summarized by the court in the Slutskys' previous appeal,[5] the government's investigation and the evidence at trial showed some $18,000,000 in total bank deposits over the period 1965–67. Some $5,700,000 was eliminated as non-income and the remaining $12,300,000 was charged as gross income for the purposes of the bank deposits analysis. Of this total, $2,800,000 consisted of specifically identified items, but most of the deposits, some $8,600,000, were in checks of less than $1,000 and were unidentified. Another $1,000,000 in deposits were cash and therefore also unidentified. 487 F.2d at 841. Allowing for deductions from the $12,300,000 total and subtracting the income actually reported, the amount which the government's proof showed was omitted from the Slutskys' tax returns was $1,200,000, for a total tax deficiency of approximately $750,000.

The evidence alleged to be newly discovered which formed the basis of the Slutskys' motion for a new trial was uncovered by the attorneys engaged to prepare a petition for a writ of certiorari to the Supreme Court. While conducting an independent examination of the facts relating to their clients' case, the lawyers came across financial statements of the Nevele Acres, another enterprise owned and operated by the Slutskys. The statement showed an obligation in excess of a million dollars due and owing from the Nevele Hotel to Nevele Acres.[6] According to the "Attorney's Affirmed Statement" in the motion papers, further inquiry showed that it was customary to effect large transfers of funds from Nevele Acres and two other cash-rich Slutsky enterprises to the Nevele Hotel in order to permit the Hotel to cash the payroll checks of its employees. The payroll checks were thereafter deposited into two of the Hotel's bank accounts and therefore would have been reflected in the total deposits figure used by the government in its bank deposits analysis. The appellants contend[7] that all the payroll checks were in face amounts of less than $1,000 and thus were unidentified items attributed by the government to income sources. However, the Slutskys argue, cash transferred to the Nevele Hotel from another partnership to meet payroll needs cannot be considered income to the Hotel, and therefore deposits of the cashed payroll checks actually represent non-income items. And since

---

3. In their motion the appellants also presented a claim of ineffective assistance of counsel, however, the denial of this aspect of the motion has not been pressed on appeal.

4. The facts are set out more fully in this court's decision affirming the convictions. See 487 F.2d 832, 835–38.

5. Figures have been rounded off for ease of comprehension.

6. Contrariwise, there is no indication that a corresponding debit was on the books of the Nevele Hotel which may explain why the government's investigation did not lead to Nevele Acres.

7. The appellants engaged the accounting firm of Haskins & Sells to examine the bank accounts and prepare a schedule of the payroll checks deposited in them.

cashed payroll checks account for more than $1,500,000 in deposits over the relevant three-year period,[8] a sum which exceeds the $1,200,000 which the appellants were accused of not reporting, there is a potential explanation for the discrepancy between the size of the deposits and reported income. As a consequence, they argue that the district court erred in denying their motion for a new trial.

Motions for new trials based on newly discovered evidence "are not held in great favor," United States v. Catalano, 491 F.2d 268, 274 (2d Cir.), cert. denied, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974). To succeed on such a motion a defendant must show, *inter alia*, (1) that the evidence was discovered after trial, (2) that it could not, with the exercise of due diligence, have been discovered sooner, (3) that it is so material that it would probably produce a different verdict. United States v. Costello, 255 F.2d 876, 879 (2d Cir.), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958), *citing* Berry v. State, 10 Ga. 511, 527 (1851). We believe that the district court was amply justified in concluding that the Slutskys had not fulfilled the first two requirements, and we need not decide whether, if true, the evidence would have mandated an acquittal.[9]

There is no question that the appellants must have known of payroll check-cashing practices at the Hotel. As principals of both the transferor and transferee enterprises, they were actively involved in management and most assuredly would have been aware of large transfers of funds between the concerns.

Indeed, the checks effecting the transfers were assertedly made payable to one or the other of the appellants.[10] Thus, assuming that cash transfers were made to the Hotel,[11] this evidence can be considered to be newly discovered, if at all, only in the sense that the appellants were not, at the time of the trial, aware of the implications of the payroll practice. But even if it be assumed that the potential significance could for a time have escaped two experienced and successful businessmen on trial for tax evasion,[12] an accountant even testified about the practice of keeping $15,000–$18,000 per week at the Hotel for cashing payroll checks. This testimony should have been sufficient to raise the appellants' awareness level and to bring home the importance of attributing these funds to non-income sources.

In short, although the new attorneys retained by the Slutskys may have uncovered evidence that seemed startling to them, there is no doubt that their clients knew, or at the very least with the exercise of due diligence should have known, of the existence of any such exculpatory evidence and its ramifications. It is far too late for seasoned businessmen with a thorough knowledge of their operations and access to all pertinent records to claim that they were unable to comprehend the nature of the case against them or to decide what evidence might be helpful to their cause. Had the appellants and their able trial counsel been inclined to present the evidence which is now claimed to be "newly discovered," they clearly had the tools to do so at the time of the trial. One can only

---

**8.** Deposits of checks other than payroll checks, according to the appellants, brings total deposits of allegedly non-income items to $1,880,000.

**9.** It is impossible to predict on the basis of the record before us the precise effect of this evidence. Since the evidence relates directly to other Slutsky enterprises, introduction of it would necessarily lead to an examination of the finances of those operations with all the attendant complexities that such an investigation would generate.

**10.** Appendix 25–26.

**11.** Significantly, although the motion papers contain affidavits by both of the appellants,

nowhere does either of them swear that transfers of funds were made from Nevele Acres and other concerns to the Nevele Hotel for the purpose of cashing payroll checks. See Appendix 45–49.

**12.** The appellants state that they were advised by their trial counsel that the government had no case against them and hence were not made aware of the importance of the payroll check cashing operation of the Nevele Hotel. Appendix 26. The district court termed this contention "simply not credible." Appendix 74–75.

speculate why they did not. Perhaps they did not care to subject the other Slutsky enterprises to audit.

■ The foregoing discussion suffices to demonstrate the failure of the appellants to meet the prerequisites for a new trial set out in *Costello, supra.* Nor was it necessary to hold a hearing before ruling on the motion. United States v. Johnson, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946); United States v. Catalano, *supra; see* 8A Moore's Federal Practice ¶ 33.03[3] (1974 Revision). The moving papers themselves disclosed the inadequacies of the defendants' case, and the opportunity to present live witnesses would clearly have been unavailing.

## II.

The appellants' timely Rule 35 motion for reduction of sentence was filed on July 22, 1974, and denied by the district court without a hearing, in an endorsement dated July 24, 1974. Two days thereafter the appellants began serving their sentences.

■ A motion for reduction of sentence is "essentially a plea for leniency" and also "affords the judge an opportunity to reconsider the sentence in light of any new information about the defendant or the case . . . ." United States v. Ellenbogen, 390 F.2d 537, 543 (2d Cir.), cert. denied, 393 U.S. 918, 89 S.Ct. 241, 21 L.Ed.2d 206 (1968). Ordinarily the disposition of the motion is within the sound discretion of the district judge, and the scope of appellate review is quite narrow. United States v. Stumpf, 476 F.2d 945 (4th Cir. 1973); United States v. Jones, 444 F.2d 89 (2d Cir. 1971). The appellants, however, seek to avoid that rule by showing that

when the sentences were imposed in March 1973, the district judge was laboring under a serious mistake of fact concerning the parole implications of the sentences. As a consequence, they argue, their sentences should be vacated. *Cf.* United States v. Malcolm, 432 F.2d 809 (2d Cir. 1970) (Sentence vacated because sentencing judge mistaken about the prior criminal record of a defendant whom he sentenced).

The alleged mistake of fact relates to the United States Board of Parole's administration of 18 U.S.C. § 4208(a)(2) (1970),[13] the provision under which the appellants were sentenced. Section 4208(a)(2) permits the sentencing judge to specify that a defendant be "eligible for parole at such time as the board of parole may determine", thus making him immediately eligible for parole, at the discretion of the Board of Parole. In contrast, a defendant receiving a regular sentence is by statute not eligible for parole until he has served one-third of his sentence. 18 U.S.C. § 4202 (1970). The appellants argue that the district court must have employed an (a)(2) sentence with the expectation that the Board of Parole would consider them for early release, taking into account their prison performance and other relevant factors. They contend, however, that the Board of Parole has ignored the possibilities for early release which section 4208(a)(2) provides.

■ In part, this argument was presented to the district court. The appellants produced statistics showing that the average time served under an (a)(2) sentence is actually longer than the average time served under a regular sentence.[14] On the basis of this data, the

---

**13.** 18 U.S.C. § 4208(a) provides in pertinent part:

(a) Upon entering a judgment of conviction, the court having jurisdiction to impose sentence, when in its opinion the ends of justice and best interests of the public require that the defendant be sentenced to imprisonment for a term exceeding one year, may . . . (2) the court may fix the maximum sentence of imprisonment to be served in which event the court may specify that the prisoner may

become eligible for parole at such time as the board of parole may determine.

**14.**

| | 1966 | 1967 | 1968 | 1969 | 1970 | 1972 |
|---|---|---|---|---|---|---|
| "Regular" Adult Sentence | 17.4 | 20.8 | 18.1 | 19.1 | 20.7 | 24.9 |
| 4208(a)(2) Sentence | 18.7 | 20.9 | 18.8 | 19.0 | 20.4 | 25.5 |

(Figures represent months served)

The appellants derived these statistics from the United States Board of Parole, Biennial

district judge declined to alter the sentences originally imposed. This response, in our view, is quite understandable. Figures showing merely the average length of time served are of course insufficient to show that the Board of Parole is disregarding the early release possibilities of section 4208(a)(2). For example, they do not reflect the average length of sentence imposed which may well be longer for (a)(2) sentences, particularly in view of the fact that an (a)(2) sentence of less than one year may not be imposed.[15]

Were this the end of the matter, we would be constrained to affirm the denial of the Rule 35 motion. But intervening developments, of which the district court could hardly have been aware, elucidating the Board of Parole's policies with respect to 4208(a)(2) prisoners, have enhanced the position advanced by the appellants. We are convinced that the parole consideration afforded the Slutskys is likely to depart substantially from what we must assume were the reasonable expectations of the district judge. Accordingly, we think that a remand for resentencing is appropriate in order to allow the district judge an opportunity to reconsider the original sentence in light of these new circumstances.

We refer particularly to the Board of Parole's newly-issued parole decision-making guidelines, 28 C.F.R. § 2.20 (1974), and related regulations. Of interest as well for the light they shed upon Board policies are recent cases dealing with the habeas corpus petitions of 4208(a)(2) prisoners aggrieved by the failure of the Board of Parole to consider them for parole until well after the one-third point in their sentences, the point when regular prisoners are considered. E. g., Garafola v. Benson,, 505 F.2d 1212 (7th Cir. 1974); Stroud v. Weger, 380 F.Supp. 897 (M.D.Pa.1974); Grasso v. Norton, 371 F.Supp. 171 (D.Conn.1974) (Grasso I); Grasso v. Norton, 376 F.Supp. 116 (D.Conn.1974) (Grasso II), appeal pending, No. 74–1222 (2d Cir.). Although the guidelines were available at the time of the appellants' Rule 35 motion,[16] they were not cited in support of it. Nor had the use of guidelines for (a)(2) prisoners been well publicized, at least among judges in this Circuit, who remained largely ignorant of the practice until well after the denial of the instant motion on July 24, 1974.[17] The guidelines for adult offenders are set out in the appendix to this opinion. They are in tabular form, indicating the customary range of time to be served before release for various combinations of offense and offender characteristics. Offenses are classified into one of six categories (ranging from "low" to "greatest") based on the severity of the offense, and the guidelines give examples of offenses which fall within each category. There are four classifications of offender characteristics (ranging from "poor" to "very good"), and a prisoner falls within one of them depending upon his parole prognosis (salient factor score). There is no distinction made be-

Report, at 24 (1970) and the Biennial Report for 1972.

15. At the time of the enactment of section 4208(a)(2), Congress was aware that terms served under indeterminate sentences averaged longer than those under a system of fixed penalties. See Senate Report No. 2013, 85th Cong., 2d Sess., 2 U.S.Code Cong. & Admin. News, pp. 3891, 3893 (1958); Conference Report No. 2579, 85th Cong., 2d Sess., 2 U.S. Code Cong. & Admin.News, pp. 3905, 3906 (1958).

16. Use of parole guidelines was apparently started on a pilot basis in October 1972, see Battle v. Norton, 365 F.Supp. 925, 929–30 n. 4 (D.Conn.1974) and officially adopted in No-

vember 1973. 38 Fed.Reg. 31912 (1973). The present guidelines, as slightly revised in April 1974, were published on June 5, 1974, 39 Fed. Reg. 20028, 20031 (1974), along with a new codification of the Board of Parole's new rules and regulations. The use of guidelines has been upheld in Wiley v. United States Board of Parole, 380 F.Supp. 1194 (M.D.Pa.1974), and Battle v. Norton, supra.

17. Insofar as we know, judges in this Circuit were not generally aware of the Board of Parole's use of guidelines in the cases of (a)(2) prisoners until the annual Circuit Conference held on September 6–7, 1974, which focused on sentence disparity.

tween an (a)(2) prisoner and a prisoner who received a regular sentence under section 4202. We are told that both Julius and Ben Slutsky have the best possible salient factor score and that their offenses (evasion of more than $100,000 in taxes) will probably be classified by the Board of Parole as having "very high" severity.[18] Under these circumstances, the guidelines indicate a term of confinement ranging from 26 to 36 months. On the other hand, under the (a)(2) sentence, the district judge must have been satisfied to have the Board of Parole release the appellant at some time less than 20 months (less than ⅓ of 60 months).

From all indications, the guidelines are relied upon heavily in making parole determinations. For example, the Board's regulations, while reciting that the prescribed time ranges are "merely guidelines", nevertheless seem to reserve parole below the guidelines to the exceptional case.[19] The district court in *Grasso II, supra,* made a specific finding that the guidelines are applied in between 92% and 94% of all cases. 376 F.Supp. at 119. *See also* Garafola v. Benson, *supra,* 505 F.2d at 1214–15 & n. 3. Whether the district court's unawareness of the substantial reliance on the guidelines for the purposes of final decisions, standing alone, would be sufficient cause for a remand is uncertain. Perhaps the utilization of the guidelines is not so mechanical as to be incompatible with the degree of discretion the district court knew it was granting the Board of Parole by sentencing under section

4208(a)(2). But we need not decide this question because the Board of Parole's own procedures, coupled with its use of the guidelines, nearly assure that the parole consideration afforded the appellants will differ significantly from what we believe the sentencing court must have expected.

As we read the regulations of the Board of Parole, (a)(2) prisoners receive an initial parole hearing within a few months of the commencement of their sentences. *See* 28 C.F.R. § 2.13. This contrasts with prisoners receiving regular sentences, who receive their initial hearing after having served one-third of their sentences. Because only a few months in prison is not long enough to permit an individual to demonstrate a pattern of good prison performance, ordinarily serious parole consideration is not given at the (a)(2) prisoner's initial hearing. *See* Garafola v. Benson, *supra,* 505 F.2d at 1215; *Grasso I, supra,* 371 F.Supp. at 174. Instead, each case is generally continued to a future date when parole again will be considered. This date is not fixed by regulation, but in view of the Board's reliance on the guidelines, presumably a substantial number of cases are continued to about the point where the guidelines dictate that they should be released. See *Grasso II, supra,* 376 F.Supp. at 119. For the appellants, this approach indicates continuation to a point when they will have served about 26 months. In the meantime, the only scheduled parole consideration they will receive is at the one-third point in their sentences (20 months).[20]

---

18. Although the guidelines do not list income tax evasion of greater than $100,000 within one of its severity categories, Note 1 to the tables indicates that analogies to similar offenses should be used. And since no non-violent offense involving more than $100,000 is ranked "high" in severity, it can be inferred that tax evasion of over $100,000 will be ranked greater than "high." But tax evasion cannot be compared to the crimes listed under "greatest" severity (murder, kidnapping, etc.) hence it can be assumed that "very high" is the appropriate category.

19. 28 C.F.R. § 2.20(c) (1974) provides in part: Where the circumstances warrant, decisions outside of the guidelines (either above or

below) may be rendered. For example, cases with exceptionally good institutional program achievement may be considered for earlier release.

20. 28 C.F.R. § 2.14(b) currently provides that at the one-third point in their sentences (a)(2) prisoners previously continued beyond that point will receive an on-the-record review of their files, including an institutional progress report. The regulation appears to have been adopted as a concession to the decision in *Grasso I* that (a)(2) prisoners could not receive less favorable parole treatment than prisoners serving regular sentences. Whether this form of review, as opposed to an in-person hearing, is adequate has been the subject of conflicting

As a consequence of these procedures, it is likely that the appellants will receive no serious parole consideration until the one-third point in their sentences, the same time when they would have been considered had they received a regular sentence under section 4202.[21] See Garafola v. Benson, *supra,* 505 F.2d at 1215. Thus, from the standpoint of an opportunity for early release, the (a)(2) prisoner is in no better position than a prisoner who has received a regular sentence.[22] Whether these practices of the Board of Parole comport with the purposes of section 4208(a)(2) we need not decide in this case. That question is presently before this court in the now-pending appeal in *Grasso II.* For the narrow purposes of this case, we need only determine whether the procedures are consistent with what we must assume were the reasonable expectations of the sentencing judge. We conclude that they are not. We, of course, have no way of recapturing the thoughts of the district judge when he imposed a 4208(a)(2) sentence. Our assumption must be based upon what our own perception of section 4208(a)(2) would have been in March 1973, when sentence was first imposed, and in July 1974, when the motion for reduction of sentence was denied. And reading section 4208(a)(2) in conjunction with section 4202, we would have expected that the Board of Parole give meaningful consideration to parole at some point before the one-third point in the sentence when the prisoner would have received it anyway. This is not to say that we would have expected the Board of Parole necessarily to release the prisoner at that time, but rather that it give serious thought to the possibility of doing so. Otherwise, or at least we would have so thought, section 4208(a)(2) is rendered wholly nugatory. The Sev-

enth Circuit in Garafola v. Benson, *supra,* recently reached the same conclusion with respect to the expectations of sentencing judges:

> The judge who sentences a prisoner under § 4208(a)(2) ordinarily contemplates that, at an appropriate time before the one-third point in the sentence, the Parole Board will exercise a meaningful judgment upon, *i.e.,* give "serious consideration" to, the question of whether the prisoner should be paroled before the one-third point.

505 F.2d at 1217–18 (footnote omitted).

Since in all probability the appellants will not receive the parole treatment envisioned by the sentencing judge, there should be an opportunity for reconsideration in light of all recent developments in the area. An unfortunately mistaken assumption about the effect of a section 4208(a)(2) sentence perhaps does not rise to the level of a sentencing judge's mistaken impression of a defendant's prior criminal record. *See* United States v. Malcolm, 432 F.2d 809, 815–16 (2d Cir. 1970). There is no question that the decision of whether actually to release the appellants would remain with the Board of Parole regardless of when their cases were considered. But the parole implications of a sentence are a necessary and important factor for the consideration of the sentencing judge. And when, as here, there has been a timely motion for reduction of sentence, and the mistake is easily rectified by providing for resentencing, the interests of justice mandate such a procedure.

Accordingly, the denial of the motion for a new trial is affirmed; the sentences of the appellants are vacated and their cases remanded to the district court for resentencing.

See Appendix to follow.

---

decisions. *Compare* Garafola v. Benson, *supra,* 505 F.2d at 1219, and *Grasso II, supra,* 376 F.Supp. at 119, *with* Stroud v. Weger, *supra,* 380 F.Supp. at 901. We need not consider this matter and express no opinion on it.

21. To be sure, there is always the possibility that a prisoner's case may be reopened after it has been continued to a future date. *See* 28 C.F.R. §§ 2.15, 2.28. However, this bare possi-

bility cannot substitute for a regularly scheduled review.

22. As a result of having his initial hearing after only a few months, an (a)(2) prisoner does, however, find out at an early date when the guidelines indicate that he will be released. Other prisoners do not learn the same information until approximately the one-third point in their sentence.

# APPENDIX

(Revised April 1974)

*Adult guidelines for decisionmaking, average total time (in months) served before release (including jail time)*

| Offense characteristics—Severity of offense behavior (examples) | Offender characteristics—Parole prognosis (salient factor score) | | | |
|---|---|---|---|---|
| | Very good (11–9) | Good (8–6) | Fair (5–4) | Poor (3–0) |
| *Low* | 6–10 | 8–12 | 10–14 | 12–16 |
|   Immigration law violations | | | | |
|   Minor theft (includes larceny and simple possession of stolen property less than $1,000) | | | | |
|   Walkaway | | | | |
| *Low moderate* | 8–12 | 12–16 | 16–20 | 20–25 |
|   Alcohol law violations | | | | |
|   Counterfeit currency (passing/possession less than $1,000) | | | | |
|   Drugs: Marijuana, possession (less than $500) | | | | |
|   Firearms Act, possession/purchase/sale single weapon—not altered or machinegun | | | | |
|   Forgery/fraud (less than $1,000) | | | | |
|   Income tax evasion (less than $3,000) | | | | |
|   Selective Service Act violations | | | | |
|   Theft from mail (less than $1,000) | | | | |
| *Moderate* | 12–16 | 16–20 | 20–24 | 24–30 |
|   Bribery of public officials | | | | |
|   Counterfeit currency (passing/possession $1,000–$19,999) | | | | |
|   Drugs: | | | | |
|     "Hard drugs," possession by drug user (less than $500) | | | | |
|     Marijuana, possession ($500 or more) | | | | |
|     Marijuana, sale (less than $5,000) | | | | |
|     "Soft drugs," possession (less than $5,000) | | | | |
|     "Soft drugs," sale (less than $500) | | | | |
|   Embezzlement (less than $20,000) | | | | |
|   Explosives, possession/transportation | | | | |
|   Firearms Act, possession/purchase/sale altered weapon(s), machinegun(s), or multiple weapons | | | | |
|   Income tax evasion ($3,000–$50,000) | | | | |
|   Interstate transportation of stolen/forged securities (less than $20,000) | | | | |
|   Mailing threatening communications | | | | |
|   Misprison of felony | | | | |
|   Receiving stolen property with intent to resell (less than $20,000) | | | | |
|   Smuggler of aliens | | | | |
|   Theft, forgery/fraud ($1,000–$19,999) | | | | |
|   Theft of motor vehicle (not multiple theft or for resale) | | | | |
| *High* | 16–20 | 20–26 | 26–32 | 32–38 |
|   Burglary or larceny (other than embezzlement) from bank or post office | | | | |
|   Counterfeit currency (passing/possession $20,000 or more) | | | | |
|   Counterfeiting (manufacturing) | | | | |
|   Drugs: | | | | |
|     "Hard drugs," possession by drug-dependent user ($500 or more) | | | | |
|     "Hard drugs," sale to support own habit | | | | |
|     Marijuana, sale ($5,000 or more) | | | | |
|     "Soft drugs," possession ($5,000 or more) | | | | |
|     "Soft drugs," sale ($500–$5,000) | | | | |
|   Embezzlement ($20,000–$100,000) | | | | |
|   Interstate transportation of stolen/forged securities ($20,000–$100,000) | | | | |
|   Mann Act (no force—commercial purposes) | | | | |
|   Organized vehicle theft | | | | |
|   Receiving stolen property ($20,000–$100,000) | | | | |
|   Robbery (no weapon or injury) | | | | |
|   Theft, forgery/fraud ($20,000–$100,000) | | | | |
| *Very high* | 26–36 | 36–45 | 45–55 | 55–65 |
|   Robbery (weapon) | | | | |
|   Drugs: | | | | |
|     "Hard drugs," possession by nondrug-dependent user ($500 or more) or by nonuser (any quantity) | | | | |
|     "Hard drugs," sale for profit [no prior conviction for sale of "hard drugs"] | | | | |
|     "Soft drugs," sale (more than $5,000) | | | | |
|   Extortion | | | | |
|   Mann Act (force) | | | | |
|   Sexual act (force) | | | | |
| *Greatest* | (Greater than above—however, specific ranges are not given due to the limited number of cases and the extreme variations in severity possible within the category.) | | | |
|   Aggravated felony (e.g. robbery, sexual act, assault)—weapon fired or serious injury | | | | |
|   Aircraft hijacking | | | | |
|   Drugs: "Hard drugs," sale for profit [prior conviction(s) for sale of "hard drugs"] | | | | |
|   Espionage | | | | |
|   Explosives (detonation) | | | | |
|   Kidnapping | | | | |
|   Willful homicide | | | | |

## NOTES

1. If an offense is not listed above, the proper category may be obtained by comparing the severity of the offense behavior with those of similar offenses listed.

2. If an offense behavior can be classified under more than one category, the most serious applicable category is to be used.

3. If an offense behavior involved multiple separate offenses, the severity level may be increased.

4. If a continuance is to be given, allow 30 days (1 month) for release program provision.

5. These guidelines are predicted upon good institutional conduct and program performance.

6. "Hard drugs" include heroin, cocaine, morphine, or opiate derivatives, and synthetic opiate substitutes.

OAKES, Circuit Judge (concurring):    I concur in the result.