Charles M. BERNUTH and Shirley P. Bernuth, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

ESTATE of Carl VON BERNUTH, Deceased, Elizabeth von Bernuth, Executrix, et al., and Elizabeth von Bernuth, Surviving Wife, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

No. 209, Docket 72–1736.

United States Court of Appeals, Second Circuit.

Argued Nov. 13, 1972.

Decided Dec. 12, 1972.

---

Alvin D. Lurie, New York City (Richard N. Gray, New York City, of counsel), for appellants.

Grant W. Wiprud, Atty., Tax Div., Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks and Richard Farber, Attys., Tax Div., Dept of Justice, Washington, D. C., of counsel), for appellee.

Before SMITH, KAUFMAN and MULLIGAN, Circuit Judges.

SMITH, Circuit Judge:

Charles M. Bernuth, Shirley P. Bernuth, Elizabeth von Bernuth, and the Estate of Carl von Bernuth have appealed from a decision of the Tax Court, 57 T.C. 225 (1971), sustaining the Commissioner's determination of deficiencies in their income taxes for the year 1959. The question presented for review is whether appellants were entitled to claimed deductions for "intangible drilling and development costs" for several oil and gas wells in which they had frac-

tional interests. For the reasons stated below, we answer that question in the negative, and affirm the decision of the Tax Court.

The facts below, while complex, were stipulated. Since they are outlined exhaustively in the opinion of the Tax Court, we shall summarize them but briefly here. Three of the appellants, Charles M. Bernuth and Carl and Elizabeth von Bernuth, entered into oil and gas ventures promoted by Barnwell Production Company, a Louisiana partnership.[1] Each taxpayer acquired from Barnwell fractional working interests (ownership) in oil and gas leases in Pike County, Mississippi, and agreed to participate in the drilling of wells on the leaseholds. The agreements provided that each taxpayer would pay Barnwell a fixed sum for his participation in the drilling of a well at a specified location to a particular depth. In addition, each taxpayer agreed to pay his share of the costs of completing and readying for commercial production any well which proved successful.

The agreements set out the price of a full 100 per cent working interest in each well, the percentage participation of each taxpayer, the full "turnkey to casing point" drilling cost,[2] the cost to each taxpayer of his fractional working interest, and the taxpayer's fractional share of the drilling costs. For the four wells in controversy, the figures in the participation agreements can be summarized by the following table:

|  | Fred Bacot # 1 | Eugene W # 1 | Eugene W # 2 | Eugene W # 3 |
|---|---|---|---|---|
| 100 Percent Working Interest | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 |
| Full Turnkey Drilling Cost * | $205,000 | $205,000 | $205,000 | $205,000 |
| **CHARLES BERNUTH** | | | | |
| Percentage Participation | 4.00 | 4.00 | 3.732 | 3.00 |
| Working Interest | $ 600.00 | $ 600.00 | $ 559.80 | $ 450.00 |
| Drilling Cost | $8,200.00 | $8,200.00 | $7,650.60 | $6,150.00 |
| **CARL VON BERNUTH** | | | | |
| Percentage Participation | 2.00 | 2.00 | 1.866 | —— |
| Working Interest | $ 300.00 | $ 300.00 | $ 279.90 | —— |
| Drilling Cost | $4,100.00 | $4,100.00 | $3,825.30 | —— |
| **ELIZABETH VON BERNUTH** | | | | |
| Percentage Participation | 2.00 | 2.00 | 1.866 | 3.00 |
| Working Interest | $ 300.00 | $ 300.00 | $ 279.90 | $ 450.00 |
| Drilling Cost | $4,100.00 | $4,100.00 | $3,825.30 | $6,150.00 |

* This does not include completion costs.

Each of the participation agreements was subject to an operating agreement between Barnwell Production and Barnwell Drilling Co., Inc., covering the development and operation of the wells. Barnwell Drilling is a corporation, the

1. While appellant Shirley P. Bernuth did not sign any of the agreements, she filed a joint return with her husband Charles for the year in question.

2. On a "turnkey" job, the driller undertakes to supply everything and does all of the work necessary to complete the well, place it on production, and turn it over ready to "turn the key," and start the oil running into the tanks. *See* Retsal Drilling Co. v. Commissioner, 127 F.2d 355, 357 (5th Cir. 1942). In the case at hand, the "turnkey to casing point" contracts required Barnwell Drilling, after drilling to the agreed depth, to decide whether the well would be a producer. If the decision were affirmative, casing was set in place to ready the well for production. The cost of setting casing was treated as a completion cost, and billed to the taxpayers in addition to the originally agreed upon fixed turnkey cost.

stock of which is owned by R. S. Barnwell, Sr. and R. S. Barnwell, Jr., who are, not coincidentally, the partners in Barnwell Production. Each agreement authorized Barnwell Production to enter into a drilling contract suitable to it with Barnwell Drilling. Although no such contracts were entered into here, the actual drilling of the wells was done by Barnwell Drilling.

Barnwell Production retained a major fractional working interest in each of the wells in issue.[3] It also paid a portion of the drilling and completion costs to Barnwell Drilling although the record shows these payments to be less than Barnwell Production's proportional share.[4] No records of the amounts actually expended on drilling were maintained by Barnwell Drilling.

## I. *The Deductions Claimed*

Prior to 1943, amounts paid for drilling under turnkey contracts were considered to be capital in nature, on the theory that when a taxpayer bought a completed well, he had acquired a capital asset. *See* Commissioner v. Ambrose, 127 F.2d 47 (5th Cir. 1942); J. K. Hughes Oil Co. v. Bass, 62 F.2d 176 (5th Cir. 1932), cert. denied, 289 U.S. 726, 53 S.Ct. 523, 77 L.Ed. 1475 (1933). In 1943, the applicable regulations, Treas. Reg. 103, § 19.23(m)–19(a)(1) (1939), were amended to give the taxpayer the option to either capitalize or expense turnkey drilling costs. T.D. 5276, 1943

Cum.Bull. 151. At present, section 263 (c) of the Internal Revenue Code of 1954, 26 U.S.C. § 263(c), authorizes the promulgation of regulations granting the option to deduct as expenses "intangible drilling and development costs." The pertinent regulation, 26 C.F.R. § 1.612–4, extends the option to those holding a working or operating interest in oil wells, either on a fee or leaseholder basis. The term "intangible drilling and development costs," is something of a misnomer, since the regulation defines such expenses to include sums spent for fuel, wages, repairs, hauling, etc., all of which are quite tangible.

For the taxable year 1959, each appellant made a timely election to claim in his tax return deductions for oil venture losses. These included, *inter alia*, intangible drilling and development costs incurred in the Pike County ventures sponsored by Barnwell. In all but one instance, each taxpayer claimed a deduction for intangible drilling expenses in the exact amount of the drilling costs set out in the participation agreements, plus intangible completion expenses.[5]

The Commissioner filed a notice of deficiency in each case, contending that the deductions were excessive, and that not more than $116,993.50 was the proper turnkey drilling cost for each well in question. This determination was based upon recommendations made in an "Engineering and Valuation Report" prepared separately with respect to each of

3. The working interests retained were as follows:

| Well | Working Interest Retained | Well | Working Interest Retained |
|---|---|---|---|
| Fred Bacot #1 | 34.25% | Eugene W #2 | 32.34% |
| Eugene W #1 | 29.45% | Eugene W #3 | 23.25% |

4. The drilling costs paid by Barnwell Production were:

| Well | Drilling Costs Paid | Percentage of total cost |
|---|---|---|
| Fred Bacot #1 | $........ | ...... |
| Eugene W #1 | $24,149.11 | 11.7% |
| Eugene W #2 | $30,290.80 | 14.7% |
| Eugene W #3 | $16,949.40 | 8.2% |

5. Charles Bernuth did not deduct drilling costs for the well Fred Bacot #1 in 1959.

the cases here, which were eventually consolidated for trial. Those reports based their recommendations on the average costs of drilling under straight footage contracts, adding a 30% increment to allow for the generally higher price of turnkey contracts. Thus, the $116,993.50 figure was arrived at by multiplying the going rate for drilling by a factor of 1.3, and applying that to the footages in the instant case. The Engineering Reports were received into evidence by the Tax Court for the limited purpose of showing how the Commissioner arrived at the deficiency assessment. *See* Clark v. Commissioner, 266 F.2d 698 (9th Cir. 1959).

## II. *The Taxpayer's Burden of Proof*

██ It is black-letter law that deficiency determinations by the Commissioner of Internal Revenue carry with them a presumption of correctness. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933); Helvering v. Taylor, 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935); Tax Court Rule 32. *Cf.* United States v. Lease, 346 F.2d 696 (2d Cir. 1965). The burden is on the taxpayer to show that the Commissioner is wrong, Lucas v. Structural Steel Co., 281 U.S. 264, 271, 50 S.Ct. 263, 74 L.Ed. 848 (1930); although he need not prove what the correct tax would be, *Taylor, supra,* 293 U.S. at 515–516, 55 S.Ct. 287. *See generally* 9 J. Mertens, Law of Federal Income Taxation (1965) § 50.61 et seq. Once the taxpayer shows that the deficiency assessment is wrong, the burden shifts back to the Commissioner to show the existence and amount of the deficiency. Cohen v. Commissioner, 266 F.2d 5 (9th Cir. 1959).

██ Appellants recognize the general existence of this burden, but seek to avoid it here, arguing that the Commissioner's notices of deficiencies did not fairly warn them of his theories of law and fact. *See* Helvering v. Tex-Penn Co., 300 U.S. 481, 498, 57 S.Ct. 569, 81 L.Ed. 755 (1937). While it is true that the presumption of correctness does not ex-

tend to bases of deficiency not raised in the statutory notice, Taylor v. Commissioner, 70 F.2d 619, 621 (2d Cir. 1934), aff'd 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935), that rule is of little avail to appellants here. The statutory notice clearly identified the Commissioner's basic theory, that the challenged deductions represented capital expenditures, not intangible drilling and development costs. That general theory was made quite specific by the Engineering and Valuation Reports, which appellants received before the trial below, and which taxpayers themselves entered into evidence. These reports, received for the limited purpose of explaining the deficiency determination, *see* Clark v. Commissioner, *supra,* make the Commissioner's theory crystal clear—the excess of the deduction claimed over the going rate is so great as to require explanation by the taxpayers. In view of these reports, it can hardly be said that the taxpayers were confronted with a cryptic or arbitrary deficiency determination; indeed, they were apprised of the precise reasoning of the Commissioner. *Cf.* 9 J. Mertens, *supra,* § 50.73 and n. 43.

Thus, the basic question in this case is whether the appellants overcame the presumptive correctness of the deficiency determination, or, put another way, whether they showed that the determination of deficiency was wrong. Appellants offered no evidence on the point below, but rested on the stipulation of facts. Here they argue that the stipulation met their burden, because it showed the contract price for the intangible drilling and development costs, and because the Commissioner conceded at trial that $15,000 was a reasonable price for the full working interests in these wells.

In approaching these contentions, we note, as did the Tax Court, the "package" nature of the deals here. Those dealing with Barnwell could not purchase a lease separately and then shop around for the best drilling deal. Instead, the package of working interest and drilling contract were available only on an all-or-

nothing basis. In such a situation, the availability of the intangible drilling costs option provides a strong incentive to overstate the drilling costs and minimize the working interest. The total amount of the package will remain the same, but taxpayers will have the attractive option of treating the overstated drilling costs as either capital or expenses, an alternative that could result in considerable income tax savings.

■ It is true that the Commissioner agreed here that the $15,000 price of a full working interest was reasonable. But that does not itself conclude the case. The Commissioner did not concede that $15,000 was the *only* reasonable price for a working interest; higher prices may also have been reasonable. Thus, it may well be that some of the costs ascribed to drilling are in fact more properly attributable to the working interests. Or it may be that the leaseholders' drilling payments include disguised "premiums" to the promoters—a not unlikely possibility in view of the apparent underpayment of the proportional drilling expenses by the Barnwells. To put it another way, the difference between the deductible drilling costs and the total amount paid may well be attributed to the capital cost of the total package purchased, including not only the reasonable value of the "dirt"—the proportion of the lease acquired—but also the profit premium and promotional charges included in the package. In short, while $15,000 may well be a reasonable price tag for the working interests here if purchased separately, the failure of the Commissioner to agree that it is the only reasonable price leaves the burden of proving the deficiency determination incorrect still on the taxpayer.

Appellants cite G. F. Hedges, 41 T.C. 695 (1964), as holding that the Tax Court will not look behind the agreement of the parties to a drilling contract, and thus contend that the entry into evidence of the contract drilling price shifts the burden of proving a deficiency back onto the Commissioner. It is true that the Tax Court in this case cited *Hedges* for the proposition that when a taxpayer enters into a contract for the drilling of a well, and agrees to pay too much when compared to the going rate, the amount agreed upon is not any less the cost to the taxpayer of drilling the well. But the Tax Court immediately went on to note that such a rule does not apply to "package" deals.[6] While the taxpayer independently "shopping" for a drilling contract at least begins with the clear incentive to minimize his costs (however his efforts turn out), the purchaser of a package deal, for the reasons already noted, has strong reason to overstate the drilling expenses. It was not only rational, but eminently sensible, for the court below to distinguish those situations.

Indeed, *Hedges* is distinguishable in a number of other pertinent respects. That case involved only the question of whether the taxpayer could deduct the full amount of drilling expenses paid, when the record showed that the primary drilling contractor had subcontracted the project at a price less than the total of the leaseholders' payments. The Tax Court's refusal to look behind the original contract price came only in that context, and simply noted that the drilling costs to the taxpayer were what he paid, not what the subcontractor received. Moreover, it was clear in *Hedges* that even the promoter-leaseholders paid their full proportional share of the drilling

6. While the Tax Court opinion is not explicit, it seems to view *Hedges* as a nonpackage situation; Judge Tannenwald's concurrence clearly views it as such. While our reading of *Hedges* at least leaves us with some doubt as to whether the amount of payment allocable to drilling costs there was the subject of any independent negotiation, we will accept the Tax Court's interpretation of its own decision, particularly in light of the good sense made by the distinction involved. At any rate, in view of the many distinguishable features of *Hedges* noted in the text, particularly the fact that the taxpayer there actually took the stand at trial, even a contrary reading would not change the result here.

costs, and there was no question raised of the claimed deductions including disguised payments to the promoters. Finally, and perhaps most significant, both the taxpayer and one of the promoters took the stand and testified as to the nature of their dealings in *Hedges*. The taxpayer there did not attempt to meet his burden solely through evidence of the contract price, but instead offered oral testimony to support his deductions.

■ Consequently, we agree with the Tax Court that the mere entry into evidence of the terms of the contract here did not operate to overcome the presumption of correctness given to the Commissioner's deficiency determination. In view of the obvious incentive for padding the drilling costs here, and particularly because the record showed that Barnwell was not paying its full share of those costs, the Tax Court was not at all remiss in expecting the taxpayers to come forward with proof about the reasonableness of the drilling deductions.[7] Appellants made a calculated trial decision not to do so, and should not now be heard to complain of the consequences of that choice.

III. *Other Contentions*

■ Appellants' other claims of error can be treated more quickly. They claim that the Tax Court erred in its use of the Engineering and Valuation Reports, contending that while the trial judge properly admitted these documents for the limited purpose of explaining the deficiency determination, the court's opinion made positive use of them in arriving at the final decision. While appellants correctly state the law with respect to the use of these reports, *see* Clark v. Commissioner, *supra;* Herndon Drilling Co., 6 T.C. 628 (1946); 9 J.

Mertens, *supra,* at § 50.73, they misapply that law to the facts of this case. Once the Tax Court found that the taxpayers had failed to meet their burden of proving the deficiency determination wrong, the case was over. There was no need for further reference to the Engineering Reports, for the amount of deficiency was then established by the presumptive correctness of the Commissioner's determinations, which the taxpayers had not overcome. Thus, while use of the reports beyond the limited purpose for which they were received might well have constituted error, such a fact situation does not present itself here.

Appellants also contend that the Tax Court improperly found that the claimed deductions here were attributable in part to payment of the promoters' share of the drilling costs, and thus fell under the "drilling-for-interest" exception to the intangible development costs deduction option. *See* Erwin H. Haass, 55 T.C. 43 (1970). While the record of underpayment by the promoters here might well support such a conclusion, we do not read the Tax Court opinion as embracing such a finding. Instead, when discussing the *Haass* doctrine, the Tax Court was simply offering a number of reasons why it would be inappropriate in this case to allow the taxpayers to meet their burden of proof solely through introduction into evidence of the terms of the package deal. Just as the arithmetic in *Haass* led the Tax Court to look beyond the taxpayer's characterization of certain payments as deductible drilling expenses, the circumstances here justified a finding that the appellants did not meet their burden of proof by resting on the stipulated facts.

Appellants' other contentions are without merit. The judgment of the Tax Court is affirmed.

---

7. Cf. J. Mertens, *supra,* § 24.49a, at 278: "To benefit from the option to deduct intangible drilling and development costs, *a taxpayer must show* . . . that no more than his fractional share of the costs is included in the option." (Emphasis added)