ANIELLO DELLACROCE AND MARY DELLACROCE, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ANIELLO DELLACROCE, PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5895–77, 5896–77.    Filed August 27, 1984.

*Wallace Mussoff* and *Juris G. Cederbaums*, for the petitioners.

*William M. Gross*, for the respondent.

STERRETT, *Judge*: In these consolidated cases, respondent determined income tax deficiencies and additions to tax as follows:

| Docket No. | Petitioner | Year | Deficiency | Additions to tax under Sec. 6653(b) | Sec. 6654(a) |
|---|---|---|---|---|---|
| 5895–77 | Aniello Dellacroce and Mary Dellacroce | 1968 | $80,109.47 | [1]$40,054.74 | - - - |
| 5896–77 | Aniello Dellacroce | 1965 | 54,731.00 | 27,366.00 | $1,533 |

Respondent has now conceded the addition to tax for fraud under section 6653(b) for the year 1965. After this concession and other concessions by the parties, the primary issues remaining for decision are the following:

(1) Whether petitioner, Aniello Dellacroce, received $100,000 of unreported income during 1965 for services rendered in connection with the settlement of labor problems and insuring labor peace;

(2) Whether petitioner, Aniello Dellacroce, is liable for the section 6654(a) addition to tax for failure to make estimated tax payments during 1965; and

(3) What was the fair market value of 22,500 shares of common stock of Yankee Plastics, Inc., constructively received by petitioner, Aniello Dellacroce, on April 2, 1968, for services rendered in assisting the merger of Yankee Plastics, Inc., and Mr. Hanger, Inc., and in insuring labor peace for the latter corporation.

---

[1]Respondent has determined that no part of the alleged underpayment of tax for 1968 was due to fraud on the part of Mary Dellacroce and, accordingly, seeks to impose the sec. 6653(b) addition to tax against Aniello Dellacroce, alone.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

The petitioners in docket No. 5895-77 are Aniello Dellacroce and his wife, Mary Dellacroce. Aniello Dellacroce is also the petitioner in docket No. 5896-77. The petitioners' legal residence at the time they filed their petitions herein was 232 Mulberry Street, New York, NY. Petitioners did not file a Federal income tax return for 1965. They did file a joint Federal income tax return for 1968 with the appropriate office of the Internal Revenue Service. The amounts here in dispute relate to the activities of Aniello Dellacroce, and when used hereafter in the singular, "petitioner" will refer to him alone.

Petitioner had been under criminal investigation for a number of years and remained so in 1982 at the time of the trial in this case. Petitioner was convicted of criminal conspiracy to evade income taxes due from him for 1968 and was additionally found guilty of false filing and tax evasion for 1968 in *United States v. Catalano*, 491 F.2d 268 (2d Cir. 1974), affg. an unreported District Court decision (S.D. N.Y. 1973), cert. denied 419 U.S. 825 (1974). The conviction stemmed from petitioner's failure to return as income in 1968 the value of 22,500 shares of common stock of Yankee Plastics, Inc., received by a nominee as payment for petitioner's assistance in insuring labor peace.

### 1965

Respondent determined that petitioner received a similar labor racketeering payoff in 1965 in the amount of $100,000, which petitioner failed to report. Respondent based this determination, in part, on information provided by one Frank Terranova, who acted as a Government informant in the *Catalano* case. Harvey Dratman, the revenue agent assigned to the case, received his lead to speak with Terranova through a special agent's report, which had been prepared in connection with the alleged 1965 payoff. In addition to reviewing the special agent's report, Dratman reviewed grand jury testimony provided by Terranova and others. Dratman thereafter located Terranova, who was at that time in the Federal

witness protection program, and interviewed him in a motel in Peekskill, NY. Terranova informed Dratman that Martin Goldman, president and majority shareholder of Royal Crown Bottling Co. of Newark, told him that he had paid petitioner $100,000 in 1965 for petitioner's assistance in solving labor problems at Royal Crown Bottling Co. and Hoffman Beverages, Inc.[2] Terranova admitted that he was not an eye witness to the alleged $100,000 payoff, but informed Dratman that, on numerous occasions, he had ridden with Goldman to the Ravenite Club and observed the passing of envelopes and suitcases containing money from Goldman to petitioner. Dratman concluded that Terranova was a credible informant. In issuing the deficiency notice, Dratman relied on the information Terranova provided, along with the information in the special agent's report, which among other things, indicated that there was a sudden end to labor strikes against Royal Crown Bottling Co. and Hoffman Beverages, Inc.

### 1968

On their joint Federal income tax return for 1968, petitioners reported $10,400 of "wages, salaries, and tips" and total tax of $1,401.80.

The parties have stipulated that, as a result of his conviction in *Catalano v. United States, supra*, petitioner is estopped from denying that he received 22,500 shares of Yankee Plastics, Inc., stock on April 2, 1968, that the value of those shares on that date was taxable income which was not reported in petitioners' joint Federal income tax return for that year, and that the omission was fraudulent with intent to evade tax. The parties, however, disagree on the value of that stock.

In the criminal case, the Government valued the 22,500 shares at approximately $123,000, or approximately $5.50 per share. The jury in that case did not determine the value of the stock, but the jurors were instructed that, in order to find a defendant guilty of conspiracy, they must find that "a conspiracy existed to evade and defeat a large part of the income taxes due and owing * * * by * * * Dellacroce." They were further

---

[2]Martin Goldman was convicted of conspiracy to evade income taxes in 1968, along with petitioner, in *United States v. Catalano*, 491 F.2d 268 (2d Cir. 1974), affg. an unreported District Court decision (S.D. N.Y. 1937), cert. denied 419 U.S. 825 (1974).

instructed that they could not convict on the tax evasion count unless they found beyond a reasonable doubt "that there was a substantial amount of federal income tax due and owing from the defendant." They were finally instructed that they could not convict on the false filing count unless they found beyond a reasonable doubt "that the understatement was large and substantial."

Yankee Plastics, Inc., was formed in January 1957. The corporation was engaged in the business of manufacturing plastic hangers. In August 1965, Yankee Plastics, Inc., went into chapter 11 bankruptcy, from which it emerged on December 19, 1967. It subsequently suffered a further bankruptcy in the late 1970's and went out of business.

The consolidated financial report of Yankee Plastics, Inc., for the fiscal year ended January 31, 1968, reflects a deficit in earnings of $217,379 and indicates a book value of approximately $0.14 per share of stock.

The consolidated financial statement of Yankee Plastics, Inc., for the fiscal year ended January 31, 1969, reflects a deficit in earnings of $45,067 and indicates a book value of approximately $0.40 per share of stock. A note appended to the report states that on January 31, 1969, there were outstanding options to acquire 27,500 shares of common stock at $4.25 per share, exercisable at any time between October 31, 1969, and October 31, 1971, and that in February 1969, the company granted options to two employees to acquire 3,500 common shares at $6 per share, exercisable ratably over the next 5 years. Further, the report states that in April 1969, the company sold for $2,000 a nontransferable warrant to purchase 50,000 common shares at $4.25 per share, exercisable during the 1-year period beginning October 31, 1970. Finally, the report states that in May and June 1969, the company sold 37,000 shares of its common stock at $4.25 per share to six persons, each of whom was a principal of an enterprise supplying the company with materials or services.

By agreement dated March 15, 1968, Yankee Plastics, Inc., agreed to deliver 837,000 shares of its common stock to Mr. Hanger, Inc., in return for substantially all of the latter corporation's assets, provided that at the closing, the net value of those assets was $150,000, a value of approximately $0.18 per share.

On and around April 2, 1968, the date petitioner received 22,500 shares of Yankee Plastics, Inc., stock, the corporation's stock was not listed in Moody's, Standard & Poor's, or any of the other usual financial information reference sources. However, the National Daily Quotation Service (pink sheets) did list the stock. During the period February 21, 1968, to April 18, 1968, the pink sheets indicated a rising trend in Yankee Plastics stock. The pink sheets for April 2, 1968, reflect a listing of the stock by three brokers, Russell & Saxe; Weinberg, Ost & Hayton; and J.W. Gould. Russell & Saxe quoted a bid price of 5½, and an asked price of 6½. Weinberg, Ost & Hayton quoted a bid price of 5½, and an asked price of 6¼. J.W. Gould quoted no bid price, and an asked price of 6⅞.

## Miscellaneous procedural developments

On August 18, 1981, respondent served written interrogatories upon petitioner to be answered by him in accordance with Rule 71(b), Tax Court Rules of Practice and Procedure.[3] On December 16, 1981, petitioner served on respondent his answers and objections to certain of the questions propounded by respondent. Petitioner objected to all questions pertaining to petitioner's alleged involvement in 1965 in organized crime, specifically his alleged association, as "underboss," with the Carlo Gambino "Family." Petitioner also objected to questions pertaining to the receipt of gross income during 1965 from alleged criminal activities including extortion and labor racketeering. The reasons stated for petitioner's objections were that the unanswered questions were irrelevant and improper. On January 21, 1982, respondent filed a Motion for Order Compelling the Petitioner to Serve Adequate and Complete Answers and/or Objections to Interrogatories or to Impose Sanctions under Rule 104.

On December 21, 1981, petitioner filed a motion for summary judgment pursuant to Rule 121 with respect to docket No. 5896–77, involving the year 1965. The thrust of petitioner's motion was that respondent's determination of petitioner's tax liability for 1965 was based solely on hearsay evidence and was, therefore, arbitrary, entitling petitioner to a decision as a matter of law.

---

[3]All Rule references herein are to the Tax Court Rules of Practice and Procedure.

Respondent's motion for order to compel and petitioner's motion for summary judgment were heard on February 22, 1982. In *Dellacroce v. Commissioner*, T.C. Memo. 1982–243, filed May 4, 1982, we denied petitioner's motion for summary judgment, concluding that there were genuine issues of material fact to be decided. By order, dated May 7, 1982, we granted respondent's motion to compel and ordered petitioner to serve adequate and complete answers to respondent's interrogatories on or before June 7, 1982, or the Court would impose sanctions prayed for by respondent.

Petitioner sent supplementary answers to respondent's interrogatories, dated June 14, 1982, in response to the May 7, 1982, order. However, he again refused to answer questions pertaining to his alleged involvement in 1965 with organized crime. This time his refusal was based on his constitutional privilege under the Fifth Amendment. Respondent thereafter filed a motion to impose sanctions under Rule 104, and the motion was heard on September 22, 1982. The Court sustained the Fifth Amendment claim, but reversed its opinion on whether the petition should be dismissed because of petitioner's refusal to answer the interrogatories.

At the trial of this matter the Court heard testimony from two witnesses, petitioner and revenue agent Harvey Dratman, with respect to the alleged $100,000 labor racketeering payoff at issue in docket No. 5896–77. Dratman, at petitioner's request, was called to the stand first and testified to the basis underlying the issuance of the deficiency notice. At the completion of this examination, petitioner's attorney advised the Court that there was "ample evidence that there wasn't one shred of substantive proof upon which the Government relied * * * to issue the statutory notice, and I state now the burden of going forward is on the Government with respect to the year 1965"; whereupon, after respondent cross-examined Dratman, the Court suggested that respondent go forward with the evidence. Petitioner was respondent's sole witness. Other than a specific denial of having received the $100,000 payoff in 1965, petitioner, over respondent's objections, claimed the Fifth Amendment privilege against self-incrimination with respect to practically every question propounded relating to any item of income or expenditure or any facet of his lifestyle during 1965 or any prior year. Respondent

thereupon made a motion to dismiss the case in view of petitioner's refusal to answer the propounded questions. The Court declined to rule on the motion at that time.

OPINION

*1965*

Petitioner contends that respondent's determination, that he received a $100,000 labor racketeering payoff in 1965, is arbitrary, because it was based solely on hearsay evidence and, therefore, is not entitled to the presumption of correctness. Since the determination was arbitrary, petitioner's position, in essence, is that he is entitled to judgment as a matter of law.

Respondent raises several contentions. First, he contends that dismissal of the petition for lack of prosecution is an appropriate sanction where petitioner, on constitutional grounds, refused to answer relevant interrogatories prior to the trial and relevant questions put to him at trial. Second, respondent contents that his determination of the deficiency for 1965 was not arbitrary and that his determination is established by the preponderance of the evidence in the record. Finally, respondent contends that, even if his determination was arbitrary, he has adduced sufficient evidence in the form of adverse inferences from petitioner's Fifth Amendment answers to require petitioner to go forward with evidence of his correct tax liability.

The instant case places us squarely within the middle of what has been described as "a muddy track * * * [of] decided cases regarding the so-called presumption of correctness and its impact on the burden of proof and the burden of going forward with evidence." *Llorente v. Commissioner*, 74 T.C. 260, 280 (1980) (Tannenwald, *J.*, concurring), affd. in part and revd. and remanded in part 649 F.2d 152 (2d Cir. 1981). Both parties are aware that we are in the "muddy track."

After petitioner refused to answer questions put to him at trial, respondent made his motion to dismiss docket No. 5896–77. The Court declined to rule on the motion at that time. On brief, respondent continues to pursue his argument that dismissal is the appropriate means by which to dispose of this case. In support thereof, respondent argues that the purpose of some of the interrogatories and the questions

propounded at trial was an attempt to show that petitioner was engaged in the illegal business giving rise to the determined income and that respondent had a sufficiently rational basis for believing petitioner had received $100,000 of illegal income in 1965. Respondent believes that he has a substantial need for the information, and he is unable to suggest a less drastic measure than dismissal that would remedy his inability to procure the needed information and, at the same time, protect petitioner's privilege. In addition, respondent asserts that petitioner's claim was not made in good faith and demonstrates an attempt to use the privilege as a sword rather than a shield. Although respondent acknowledges that petitioner has been under continuous criminal investigation for most of his adult life and that there was an ongoing grand jury investigation at the time of trial herein, respondent, alleges that the desired information pertaining to 1965 has a patently negligible incriminating potential in any open prosecution year. According to respondent, the criminal investigative authorities already possess the answers to the questions propounded regarding petitioner's background and connections with organized crime and, therefore, petitioner's responses would not have provided any additional leads in a criminal investigation.

Petitioner counters that his assertion of his Fifth Amendment privilege was valid and made in good faith and, therefore, that dismissal is not the appropriate means by which to dispose of this case. According to petitioner, the fact that he has been under continuous criminal investigation and remained so at the time of trial is sufficient to refute respondent's allegation that petitioner's claim was nothing more than a ruse. More specifically, petitioner believes that he was justified in refusing to testify about any facet of his income in 1965, because such information could have been used as a starting point for a net worth computation in the criminal investigation in progress at the time of trial. In addition, petitioner asserts that the unanswered questions had no bearing on the reasonableness of the deficiency notice, since they were not designed to elicit information with respect to the specific item of income in question, but were designed solely to link him to organized crime or to seek financial leads. Since the questions were not pertinent to the issue involved, that is,

whether petitioner received a specific $100,000 labor racketeering payoff in 1965, petitioner believes that no sanctions are appropriate. Finally, petitioner states that in a case such as this one; where respondent had not adduced one shred of proof, a complete injustice would result from the drastic sanction of dismissal called for by respondent.

There is no question but that the Fifth Amendment may excuse a taxpayer from responding to discovery or from testifying in this Court. However, as respondent points out, where the threat of prosecution is removed or nonexistent, we have held that the privilege is inapplicable and that the taxpayer may be compelled to respond to discovery or to testify. *Rechtzigel v. Commissioner*, 79 T.C. 132 (1982), affd. 703 F.2d 1063 (8th Cir. 1983); *Harper v. Commissioner*, 54 T.C. 1121 (1970); *Romanelli v. Commissioner*, 54 T.C. 1448 (1970), revd. and remanded on another issue 466 F.2d 872 (7th Cir. 1972). Furthermore, we have dismissed petitions, thereby granting judgment for respondent, in situations where taxpayers have refused to comply with discovery orders on fanciful constitutional grounds. See, e.g., *Rechtzigel v. Commissioner, supra.*[4]

Even in cases where the validity of a Fifth Amendment claim is not questioned, it appears that the majority rule in State court civil proceedings is that dismissal of a complaint is the appropriate remedy if the plaintiff exercises his privilege against self-incrimination to refuse to answer questions pertinent to the issues involved. See 4 A.L.R. 3d 545 (1965), and the cases cited therein. Similarly, some Federal courts have shown no hesitation in dismissing civil cases where the plaintiff exercises his privilege against self-incrimination to refuse to answer pertinent questions. See Heidt, "The Conjurer's Circle—The Fifth Amendment Privilege in Civil Cases," 91 Yale L. J. 1062, 1087–1088 (1982), and cases cited therein.

Our disposition of respondent's motion to dismiss is discretionary. Rule 50(b) provides, in part:

---

[4]See also *Antelman v. Commissioner*, T.C. Memo. 1981–511; *Gaar v. Commissioner*, T.C. Memo. 1981–595.

(b) Disposition of Motions. A motion may be disposed of in one or more of the following ways, *in the discretion of the Court*:

\* \* \* \* \* \* \*

(3) The Court may take such action *as the Court in its discretion deems appropriate,* \* \* \* if any, which the Court may consider reasonable. \* \* \* [Emphasis added.]

Under the circumstances of this case, we decline to grant respondent's motion to dismiss docket No. 5896–77.

While we harbor reservations about whether petitioner's refusal to answer some of the questions propounded was actually based on good-faith Fifth Amendment claims, we were not prepared at trial to compel petitioner to answer those questions. The Supreme Court has suggested that a response may not be compelled unless it is " '*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate." *Hoffman v. United States*, 341 U.S. 479, 488 (1951) (quoting *Temple v. Commonwealth*, 75 Va. 892, 898 (1881)). Not having been privy to the information already within the possession of the criminal investigative authorities engaged in the ongoing investigation of petitioner and not having been made aware of the years barred from criminal prosecution by the statute of limitations, we were simply unable to conclude that the called-for responses, had they been given, would not have led to a criminal conviction or at least have furnished a link in the chain of evidence that could lead to prosecution. Cf. *Hoffman v. United States, supra* at 486. Under the circumstances presented in this case, we are no more prepared to dismiss this case for petitioner's refusal to answer questions that we were to compel him to answer. Petitioner has charged that respondent's deficiency determination for 1965 was arbitrary and, therefore, not entitled to its usual presumptive correctness. The charge is not frivolous, and it is one we must consider on the merits. If proven true, dismissal for failure properly to prosecute seems hardly the appropriate disposition of this case. With respondent's motion so disposed of, we now turn to the merits of the case.

It is well settled that a deficiency determination ordinarily carries with it a presumption of correctness. *Welch v. Helver-*

*ing*, 290 U.S. 111 (1933); *Bernuth v. Commissioner*, 470 F.2d 710, 714 (2d Cir. 1972), affg. 57 T.C. 225 (1971). It is also well settled that except where otherwise provided in the Internal Revenue Code or the Tax Court Rules of Practice and Procedure, the burden of proof and the burden of going forward with the evidence ordinarily rests with petitioner. *Welch v. Helvering, supra*; Rule 142. However, a showing that the statutory notice is arbitrary and excessive within the rule of *Helvering v. Taylor*, 293 U.S. 507 (1935), has the effect of shifting the burden of going forward to respondent. *Llorente v. Commissioner*, 74 T.C. at 264; *Jackson v. Commissioner*, 73 T.C. 394, 401 (1979); *Suarez v. Commissioner*, 58 T.C. 792, 813 (1972).

In asking this Court to find that the notice of deficiency is arbitrary, petitioner is asking us to explore the underpinnings of that notice. As a general rule, this Court will not look behind the statutory notice to examine the evidence used in making the determination. *Riland v. Commissioner*, 79 T.C. 185, 201 (1982); *Llorente v. Commissioner*, 74 T.C. at 264; *Jackson v. Commissioner, supra* at 400; *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327 (1974); *Suarez v. Commissioner, supra* at 813. In this connection, we have observed that "the Commissioner's determination may often rest upon hearsay or other inadmissible evidence, and we know of no rule of law calling for a review of the materials that were before the Commissioner in order to ascertain whether he relied upon improper evidence." *Rosano v. Commissioner*, 46 T.C. 681, 687 (1966).

On rare occasions, we have recognized an exception to the foregoing rule and have looked behind the notice of deficiency in cases involving unreported illegal income where the respondent introduced no substantive evidence but rested on the presumption of correctness and the petitioner challenged the notice of deficiency. *Jackson v. Commissioner, supra*. Petitioner contends that his case is governed by the exception rather than the general rule. Respondent argues that the instant case is fundamentally distinguishable from the recent line of cases holding a deficiency notice arbitrary: *Llorente v. Commissioner*, 649 F.2d 152 (2d Cir. 1981), affg. in part and revg. on this issue and remanding 74 T.C. 260 (1980); *Weimerskirch v. Commissioner*, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977); *Jackson v. Commissioner, supra*. For the reasons here-

inafter given, we must agree with petitioner that the deficiency determination was arbitrary.

In *Weimerskirch v. Commissioner, supra,* the revenue agent based a computation of omitted income from heroin sales on statements made by two confidential informants, together with additional information obtained from the Drug Enforcement Administration of the Department of Justice, the Yakima Police Department, and the Spokane Police Department. We held that, based on the revenue agent's testimony and an in camera inspection of the informants' statements, the Commissioner's determination was not arbitrary and unreasonable. The Ninth Circuit reversed our decision, concluding that the Commissioner offered no evidence linking the taxpayer to the sale of narcotics. The court held that "deficiency determination which is not supported by the proper foundation of substantive evidence is clearly arbitrary and erroneous." 596 F.2d at 362. In so holding, the Ninth Circuit relied heavily on the Supreme Court's dictum in *United States v. Janis,* 428 U.S. 433 (1976). In that case, the Supreme Court, in discussing the scope of the exclusionary rule in civil tax cases, stated that, if the illegally seized evidence could not be used, then the result would be "a 'naked' assessment without *any* foundation whatsoever," and that "proof that an assessment is utterly without foundation is proof that it is arbitrary and erroneous." 428 U.S. at 441–442.

In *Jackson v. Commissioner, supra,* the revenue agent based a computation of omitted income from drug trafficking activities on information provided by an informant. Yet, the Commissioner presented no evidence which linked the taxpayer to any narcotics operation during the year in question, much less any evidence of drug income. Moreover, we found that the informant, who did not testify, was unreliable. We concluded that the Commissioner's own evidence supported a finding that the determination was arbitrary.

In *Llorente v. Commissioner, supra,* we once again faced the issues raised in the *Jackson* and *Weimerskirch* cases. Our decision in that case with respect to whether the deficiency determination therein was arbitrary was reversed by the Second Circuit. Appeal in the instant case also lies to that Circuit and, accordingly, under the *Golsen* doctrine, we are

bound to follow the Second Circuit's decision.[5]

The deficiency determination in *Llorente* was computed under the expenditures method of reconstructing income. The Commissioner determined that the taxpayer had expended $54,000 for the purchase of cocaine during 1974, the year in question. At the trial of the case, the petitioner testified that he had not purchased any cocaine and had not entered into any dealings with others to purchase cocaine. We did not find credible petitioner's complete denial of participation in, and awareness of, illegal narcotics activity. The Commissioner's chief witness was an undercover police agent, who testified that he had seen and heard known cocaine dealers speaking with the taxpayers about future cocaine shipments. The undercover agent further testified that he was informed by a confidential informant that the taxpayer, the informant, and one of the known cocaine dealers had gone to a house to inspect 6 kilos of cocaine and that the taxpayer examined the package because some of the merchandise had been delivered in a damp condition. Based on this evidence and the additional fact that the taxpayer had been indicted for conspiring to criminally possess and sell a controlled substance and had pled guilty to the crime of attempted conspiracy to criminally possess a controlled substance, we held the notice of deficiency had not been issued arbitrarily.

The Second Circuit disagreed with our conclusion in *Llorente* that the deficiency notice was not issued arbitrarily. In that court's view, "the evidence of record must at least link the taxpayer with some tax-generating acts, such as the purchase or sale of controlled substances. * * * A mere peripheral contact with illegal conduct is insufficient." 649 F.2d at 156. Applying that standard to facts, the court concluded that the deficiency notice must be viewed as arbitrary and without factual foundation. In so concluding the court stated (649 F.2d at 156–157):

Agent Hernandez [the undercover agent] never testified to having participated in a cocaine sale involving Llorente. The mere fact that Llorente was heard to say that a particular shipment of cocaine had not yet arrived does not constitute evidence that he ever made expenditures for or sales of cocaine. Nor is the informant's story that Llorente inspected a shipment of

---

[5] *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971).

damp cocaine sufficient to support the Commissioner's determination since this was hearsay, in [sic] inadmissible to establish the truth of the facts asserted, to which Llorente's counsel properly objected * * *[6] Finally, Llorente's indictment of conspiracy and guilty plea to a charge of attempted conspiracy to criminally possess a controlled substance do not more than place him on the fringes of illegal activity. They hardly demonstrate that Llorente ever actually purchased or sold cocaine. [Fn. 7 ref. omitted.]

---

[6]*Avery v. Commissioner,* * * * [574 F.2d 467 (9th Cir. 1978)], cited by the Commissioner for the proposition that hearsay inadmissible for its truth value may nevertheless be considered in determining whether to grant a motion to relieve the taxpayer of the burden of proof, is inapposite here. See note 4, *supra.* In the subsequent *Weimerskirch* case the same court of appeals clearly held that the Commissioner's determination cannot be sustained where there is no substantive evidence in the record to support it.

The main thrust of the Second Circuit's opinion, it seems to us, is that the court will view the deficiency determination as arbitrary if the evidence of record, whatever that evidence may be, hearsay or otherwise, merely places the taxpayer in an unlawful activity, but does not link the taxpayer to some tax-generating actions. If this were as far as the Second Circuit had gone, we might well have been able to distinguish *Llorente* from the instant case on the basis that the hearsay evidence in this case, because it specifically links petitioner to a tax-generating act, that is, the receipt of a $100,000 labor racketeering payoff for services performed, is adequate to support a finding that the deficiency notice was not arbitrarily issued. However, a close reading of the Second Circuit's opinion, in particular the above-quoted excerpt, the accompanying footnote, and the cases cited therein,[6] leaves us with the firm conviction that the Second Circuit actually went much further than rest its decision on a distinction between adequate and inadequate hearsay. Specifically, we believe that the Second Circuit's opinion clearly indicates that that court will view a deficiency determination as arbitrary and unreasonable in the

---

[6]*Avery v. Commissioner,* 574 F.2d 467 (9th Cir. 1978), referred to in note 6 of the Second Circuit's opinion in *Llorente v. Commissioner,* 649 F.2d 152 (2d Cir. 1981), affg. in part and revg. and remanding 74 T.C. 260 (1980), involved the issue of whether hearsay evidence was admissible in deciding whether to grant the taxpayer's motion to shift the burden of proof, where the taxpayer had alleged that the Commissioner's determination was arbitrary. Evidently, the Second Circuit believed that the case was inapposite because the Second Circuit was focusing on whether the deficiency notice in *Llorente* was arbitrary and not on the burden of proof issue. In note 4 of *Llorente,* the court specifically stated that it was leaving for another day the issue of what effect a finding that a notice of deficiency had been prepared arbitrarily would have on which party would bear the burden of proof and the burden of going forward with the evidence.

absence of evidence in the record admissible to establish the truth of the facts asserted by the Commissioner. Thus, the fact that a deficiency determination is based on hearsay evidence that links the taxpayer to a tax-generating act would not be sufficient to show that the deficiency determination was not made arbitrarily if the Commissioner is not able to buttress that determination with substantive evidence to support it.

In the instant case, it is clear to us that the deficiency determination for 1965 was based entirely on hearsay evidence, specifically, on information garnered from a special agent's report and a personal interview with informant Terranova. In fact, double hearsay is involved. An agent testified that he was told by an informer, who did not testify, that he (the informer) was in turn told that petitioner received a $100,000 payment.[7] In essence, we have already suggested in *Dellacroce v. Commissioner*, T.C. Memo. 1982–243, that the deficiency determination was based on hearsay evidence. Thus, the deficiency determination must be held arbitrary unless we can find admissible evidence in the record to support it. In this connection respondent urges us to draw a negative inference, entitled to probative value, from petitioner's Fifth Amendment claims. In asking us to do so, respondent implicitly acknowledges, as well he must, the absence of any other admissible evidence to support the deficiency determination.

Initially we note that, even assuming it were permissible to draw negative inferences in this case, some of those inferences would not necessarily assist respondent's attempt to show that the deficiency determination was rationally based, because the unanswered questions, for the most part, were aimed at linking petitioner to organized crime, in general, and the Carlo Gambino "Family," in particular. Such a linkage would not satisfy the Second Circuit's mandate that the evidence provide a linkage to a tax-generating act. However, some of the unanswered questions arguably were intended to elicit responses that would establish the relevant linkage. For example, at one point petitioner was asked: "Did you receive a share of income from labor racketeering which in your, [sic] to the

---

[7] If the informer had testified, at least the Court could have formed some judgment as to the reasonableness of the informer's accepting the information he received from his informant; such testimony would have been relevant in making a determination whether the statutory notice was arbitrary and excessive.

Carlo Gambino criminal organization during the taxable year 1965?" In response to this question, petitioner, on the advice of his attorney, asserted his Fifth Amendment privilege.

Thus, we find it necessary to address the delicate issue of whether we should draw negative inferences from petitioner's Fifth Amendment claims.

While at one time it may have been questionable whether a negative inference could ever be drawn from a Fifth Amendment claim in a civil case, the Supreme Court laid that question to rest in *Baxter v. Palmigiano*, 425 U.S. 308 (1976). In that case, the Court held that a prison disciplinary hearing is not a criminal proceeding and that adverse inferences could be drawn against an inmate who declined to testify. In addition, the Court indicated that invocation of the privilege may be probative evidence of guilt. The Court stated that its conclusion was consistent with "the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify *in response to probative evidence offered against them*" (emphasis added). 425 U.S. at 318. After briefing in the instant case, the Second Circuit, relying on *Baxter v. Palmigiano* and the foregoing recitation of the prevailing rule, held that refusal to answer on Fifth Amendment grounds questions propounded in a civil action was competent and admissible evidence and that the trial court's charge to the jury permitting a negative inference was not erroneous. *Brink's Inc. v. City of New York*, 717 F.2d 700 (2d Cir. 1983). Similarly, we have stated that "even if it were determined that petitioner's claim of Fifth Amendment protection had validity in some respects, the Court is entitled to attach evidentiary weight to petitioner's silence." *Rechtzigel v. Commissioner*, 79 T.C. at 142 n. 10.

Thus, it is clear from the foregoing that the Fifth Amendment does not absolutely preclude an adverse inference where the privilege is claimed by a party to a civil cause, such as a proceeding in this Court. However, restrictions on drawing such an inference do exist. For example, in *Baxter v. Palmigiano, supra*, the Supreme Court was careful to distinguish its prior decisions where invocation of the Fifth Amendment, standing alone and without regard to other evidence, impermissibly formed the sole basis for a judgment against the invoker. In so doing, the Court pointed out that the disciplin-

ary decision had to be based on substantial evidence in the record and stated:

> Here, Palmigiano remained silent at the hearing *in the face of evidence that incriminated him; and, as far as this record reveals, his silence was given no more evidentiary value than was warranted by the facts surrounding his case.* * * * [425 U.S. at 318; emphasis added.]

The difficultly we have in elevating petitioner's refusal to testify herein to the level of competent and admissible evidence is that respondent would have us do so for the very purpose of rectifying his absence of any probative evidence offered against petitioner. Thus, the prevailing rule referred to by the Supreme Court in *Baxter v. Palmigiano, supra,* and by the Second Circuit in *Brink's Inc. v. City of New York, supra,* does not govern the instant case since that rule is expressly limited to refusals to testify *in response to probative evidence offered against the party refusing to testify.* Although drawing a negative inference in the instant case would not necessarily run afoul of the standards set forth in *Baxter v. Palmigiano, supra,* since the negative inference standing alone would not justify a decision against petitioner, it would significantly exceed the scope of the prevailing rule. We are not prepared at this time to transgress the prevailing rule. Accordingly, we decline to draw a negative inference, entitled to probative weight, from petitioner's Fifth Amendment claims. It follows that, since the deficiency determination for 1965 was based entirely on hearsay evidence, and since respondent produced no admissible evidence at trial to support his conclusion that petitioner received a $100,000 labor racketeering payoff in 1965, the deficiency determination must be held arbitrary under the *Golsen* doctrine and the Second Circuit's opinion in *Llorente v. Commissioner, supra.*[8]

The effect of our finding that the notice of deficiency was arbitrary is to end our inquiry in the case at bar. It is true that the Second Circuit in *Llorente* specifically stated that it was leaving for another day the issue of what effect a finding that the deficiency had been arbitrarily prepared would have on which party must bear the burden of proof and the burden of

---

[8]The above is not intended to imply an acceptance of the legal position stated by the Second Circuit in *Llorente v. Commissioner, supra.*

going forward with the evidence. 649 F.2d at 155 n. 4.[9] However, it is also true that the court stated:

Since it lacks adequate evidentiary support the Commissioner's assessment of income tax liability against Llorente based on expenditures for cocaine must be eliminated from the Notice of Deficiency. [649 F.2d at 157.]

We take the above language as a mandate, faced with the posture of this case, to eliminate from the statutory notice for 1965 its single issue, the alleged receipt of a $100,000 income payment. *Golsen v. Commissioner, supra.*

The showing that the deficiency notice was arbitrary and not entitled to the presumption of correctness shifted to respondent the burden of going forward with the evidence. *Jackson v. Commissioner, supra* at 401; *Greenberg's Express, Inc. v. Commissioner, supra* at 328; *Suarez v. Commissioner, supra* at 814. Respondent failed to go forward with any probative evidence linking the petitioner to a tax-generating act, i.e., the alleged receipt of a $100,000 payoff. It follows that petitioner must prevail on this issue. It further follows that petitioner must prevail on the issue of whether he is liable for the section 6654(a) addition to tax for failure to make estimated tax payments during 1965.

## 1968

Our sole inquiry with respect to petitioners' 1968 tax liability involves the valuation of the 22,500 shares of common stock of Yankee Plastics, Inc., constructively received by petitioner on April 2, 1968, for services rendered in assisting

[9]It is interesting that the court did not address this issue, given its dictum in *Silverman v Commissioner*, 538 F.2d 927, 930–931 (2d Cir. 1976). There the court stated:

"Naturally, if the taxpayer overcomes the presumption by presenting evidence sufficient to establish that the Commissioner's determination was erroneous it disappears from the case and the burden of proving the correct amount of tax liability shifts to the Commissioner. *Helvering v. Taylor,* * * * 293 U.S. at 514–515, 55 S. Ct. 287; *Cohen v. Commissioner,* 266 F.2d 5, 11 (9th Cir. 1959)."

*Cohen* held that the burden of proof shifts to the Commissioner once the deficiency determination has been shown to be arbitrary. *Cohen* was also cited by the Second Circuit with apparent approval in *Bernuth v. Commissioner,* 470 F.2d 710, 714 (2d Cir. 1972).

This shifting of the burden of proof is not accepted by all the circuits. The First Circuit's position is that the taxpayer always has the burden of proving the Commissioner's determination erroneous. See *United States v. Rexach,* 482 F.2d 10, 16 (1st Cir. 1973); *United Aniline Co. v. Commissioner,* 316 F.2d 701, 704 (1st Cir. 1963).

the merger of Yankee Plastics, Inc., and Mr. Hanger, Inc., and in insuring labor peace for the latter corporation.

The evidence in the record with respect to the valuation question consists largely of the conflicting opinions of petitioners' and respondent's expert witnesses. Petitioners' expert valued the stock at $0.18 per share. Respondent's expert valued the stock at $4.875 per share. Obviously, a considerable discrepancy exists.

This valuation issue is purely factual, and the burden of proof rests squarely on petitioners. *Morris v. Commissioner*, 70 T.C. 959, 988 (1978).

As a general proposition, fair market value is the price at which a willing buyer will purchase property from a willing seller, when neither part is acting under compulsion, and both parties are fully informed of all the relevant facts and circumstances. *United States v. Cartwright*, 411 U.S. 546, 551 (1973). In valuing stock, the price at which stock is sold on a stock exchange, in an over-the-counter market, or otherwise, is often the best evidence of the value of such stock. See, e.g., *W.T. Grant Co. v. Duggan*, 94 F.2d 859, 861 (2d Cir. 1938); *Robinson v. Commissioner*, 82 T.C. 467, 468 (1984); *Morris v. Commissioner, supra* at 988. Cf. sec. 20.2031–2(b)(1), Estate Tax Regs. When there are no contemporary sales of the stock, generally, the fair market value is the mean between the bid and asked prices on the valuation date. *Bankers Trust Co. v. United States*, 207 Ct. Cl. 422, 518 F.2d 1210, 1219 (1975), cert. denied 424 U.S. 966 (1976); *Meyer v. Commissioner*, 46 T.C. 65, 106 (1966), affd. on this issue 383 F.2d 883 (8th Cir. 1967). Cf. sec. 20.2031–2(c), Estate Tax Regs. However, extraordinary circumstances relating to the state of the market or the shares being valued can make market quotations unreliable indicators. See, e.g., *Bankers Trust Co. v. United States, supra* at 1219; *Robinson v. Commissioner, supra* at 468–469. Cf. sec. 20.2031–2(e), Estate Tax Regs.

In the instant case, Yankee Plastics, Inc., stock was traded in the over-the-counter market, and on and around the valuation date (April 2, 1968), the stock was quoted on a daily basis in the National Daily Quotation Service. Respondent's expert, Duane L. Krug, relied on the April 2, 1968, quotations as a starting point in valuing the stock at $4.875 per share. Specifically, he calculated the mean of the averaged bid-asked

prices, after eliminating the 6⅞ asked price quoted by J.W. Gould. Krug eliminated the 6⅞ asked price from his computations because he determined that J.W. Gould's quotations were consistently higher than those of the other two brokers listing the stock and, therefore, might not be reflective of the market. Krug then reduced the mean figure by an 18.5-percent blockage discount, computed on the basis of costs incurred by Yankee Plastics, Inc., in connection with a prior public offering. Krug attempted, but was unable, to ascertain whether there were in fact any sales at the quoted prices.

Petitioners contend that Krug's reliance on the quotation prices was erroneous because the facts and circumstances of this case indicate those quotations were not reflective of fair market value. In this connection, petitioners allege that the poor financial history of the corporation, together with the fact that the quotation prices related solely to a block of 100 shares of stock, requires that a lower value be assigned to the stock. Further, petitioners allege, without any supporting documentation, that the three brokers listed as handling the Yankee Plastics, Inc., stock on April 2, 1968, were of questionable character, had undergone continued investigation by the Securities and Exchange Commission, and in years subsequent to 1968 had either voluntarily withdrawn their dealer registrations or had them revoked. Petitioners' expert, Leon Lebensbaum, took the foregoing factors into consideration and rejected the quotation prices as determinative of fair market value. Instead, Lebensbaum relied on the book value of the stock as reflected in the January 31, 1968, and January 31, 1969, financial reports of the corporation as a starting point in valuing the stock at $0.18 per share. Specifically, he averaged the book value per share as of those respective dates, $0.14 and $0.40, and then reduced the average figure by a one-third blockage discount. Lebensbaum did not explain how he arrived at the blockage discount figure. Petitioners contend that Lebensbaum's opinion is supported by the exchange agreement dated March 15, 1968, whereby Yankee Plastics, Inc., agreed to exchange 837,000 shares of stock for approximately $150,000 worth of assets, a value of approximately $0.18 per share.

Respondent detects three major fallacies in petitioners' valuation approach. First, he contends that petitioners did not

adduce any evidence to prove that a viable market did not exist on April 2, 1968, and to show that the Court should depart from the quotation figures. Second, he alleges that petitioners' reliance on book value is patently defective in that petitioners' expert did not attempt to appraise the corporation's assets. Finally, respondent contends that the $0.18 per share valuation figure ignores the obviously great value placed on the shares by petitioner, by company officials who transferred the stock for services rendered by petitioner in settling labor problems, and by the jury who were variously instructed that they could not convict in the criminal case unless they found "that there was a substantial amount of Federal income tax due and owing" and that the Government "must prove beyond a reasonable doubt that the understatement was large and substantial."

We have considered the testimony of both the expert witnesses as well as other evidence before us, and we conclude that petitioners have failed to prove that respondent's determination of the value of stock is erroneous. Petitioners have offered no persuasive evidence that the market quotations relied on by respondent were somehow contrived and not properly reflective of the stock's fair market value on the valuation date. If the quotations were not contrived, as we must assume in the lack of any persuasive evidence to the contrary, then those quotations should reflect public knowledge of the prior financial history of the corporation, and, thus, the prior financial history of the corporation should not, standing alone, require a departure from respondent's use of the quotations. Further, the fact that the quotations related only to a block of 100 shares of stock was recognized and taken into account by respondent's expert, who reduced his valuation figure derived from those quotations by a blockage discount.

Petitioners' own evidence, as much as anything else, leads us to reject the value claimed by them. As stated, petitioners' expert valued the stock at $0.18 per share by averaging the stock's book value as reflected on the January 31, 1968, and January 31, 1969, financial statements, $0.14 per share and $0.40 per share, respectively, and then reducing the average figure by a one-third blockage discount. However, the note appended to the January 31, 1969, financial statement with

respect to stock options and warrants outstanding on January 31, 1969, or granted within 3 months thereafter, and sales of stock in May and June of 1969, although clearly not determinative of the fair market value of the stock on April 2, 1968, certainly casts considerable doubt on petitioners' expert's use of the book value of the stock to determine its fair market value. We find it difficult to believe that the fair market value of the stock on January 31, 1969, was $0.40 per share, while the exercise price of the options or warrants outstanding on that date or granted within a relatively short period thereafter ranged from $4.25 per share to $6 per share. We further note that there was brief testimony by petitioners' own expert to the effect that 4,000 shares of stock were issued in the early part of 1969 at $15 per share. Suffice it to say that we are not inclined to accept the $0.18 per share valuation figure based on book value computations in the face of these substantial discrepancies.

We must confess some bewilderment over the terms of the exchange agreement dated March 15, 1968, which would seem to support petitioners' expert's opinion. As we have indicated, ordinarily an arm's-length sale or exchange of the stock within a reasonable time before or after the valuation date is the best evidence of the stock's value. Whether or not the exchange contemplated was at arm's length we will not speculate. We simply conclude that the other evidence of record, meager as it may be, is more compelling in this case than the isolated exchange transaction.

In sum, we conclude that petitioners have failed to carry their burden of proving respondent's determination erroneous and, therefore, we sustain that determination.

*Decision will be entered for the petitioner in Docket No. 5896–77.*

*Decision will be entered under Rule 155 in Docket No. 5895–77.*

Reviewed by the Court.

DAWSON, FAY, SIMPSON, GOFFE, WILES, WILBUR, CHABOT, NIMS, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, CLAPP, and JACOBS, *JJ.*, agree with the majority opinion.

COHEN, *J.*, concurs in the result only.

SWIFT and GERBER, *JJ.*, did not participate in the consideration of this case.